# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

―――――

Argued March 20, 2007        Decided April 13, 2007

No. 05-1325

PUBLIC SERVICE ELECTRIC AND GAS COMPANY,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

NEPTUNE REGIONAL TRANSMISSION SYSTEM, LLC, ET AL.,
INTERVENORS

―――――

Consolidated with 05-1330 and 05-1335

―――――

On Petitions for Review of Orders of the
Federal Energy Regulatory Commission

―――――

*Michael E. Ward* and *John A. Levin* argued the cause for petitioners. With them on the briefs were *James H. McGrew*, *Peter K. Matt*, *David E. Goroff*, *Jodi L. Moskowitz*, and *Kenneth G. Jaffe*.

*Robert A. Weishaar, Jr.*, *Vasiliki Karandrikas*, *Judith B. Appel*, Attorney, New Jersey Division of the Ratepayer Advocate, and *Helene S. Wallenstein*, Senior Deputy Attorney General, Attorney General's Office of State of New Jersey, were on the brief for intervenor Gerdau Ameristeel Corp. and *amici curiae* New Jersey Division of the Ratepayer Advocate and New Jersey Board of Public Utilities in support of petitioners.

*Michael E. Kaufmann*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief were *John S. Moot*, General Counsel, and *Robert H. Solomon*, Solicitor. *Patrick Y. Lee*, Attorney, Federal Energy Regulatory Commission, entered an appearance.

*John N. Estes, III* argued the cause for intervenor Neptune Regional Transmission System, LLC. With him on the brief was *Donna M. Francescani*.

Before: RANDOLPH and KAVANAUGH, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

WILLIAMS, *Senior Circuit Judge*: PJM Interconnection LLC is a regional transmission organization ("RTO") that coordinates the movement of wholesale electricity in all or part of thirteen eastern states and the District of Columbia. Its more than 450 members include power generators, transmission owners, electricity distributors, power marketers, and large consumers. An open access tariff, filed with and approved by the Federal Energy Regulatory Commission, provides the terms and conditions for new interconnections. When a firm submits an interconnection request, the RTO

undertakes in sequence three types of studies estimating the cost of effecting the interconnection. The process culminates in an interconnection service agreement. This case addresses the circumstances under which PJM is permitted to repeat its interconnection studies, thereby changing the amount the interconnecting firm must pay.

Petitioners (transmission owning members of PJM, state agencies and an industrial user) argue that the tariff permits unlimited restudy prior to the completion of the interconnection service agreement. On this view, the charge for interconnection would take account of the impact of all events transpiring up to that moment. FERC found that the tariff was ambiguous on the subject, that unlimited restudy would be unreasonable, and that a better reading of the tariff would permit restudy in only a limited set of circumstances. We find FERC's reading amply worthy of deference.

* * *

Neptune is a firm sponsoring a merchant transmission project that will deliver 660 MW of capacity from New Jersey to Long Island via a high-voltage, direct-current, underwater transmission cable. Projects such as Neptune's add additional capacity to an electric grid, enhancing market integration and competition by expanding transmission and trading opportunities between regions. Neptune initiated its interconnection request with PJM in December 2000, and established its place in PJM's first-come, first-served interconnection queue in March 2001.

Interconnection provisions added to PJM's tariff in 1999 require it to undertake three studies of each queued project. The first is a "feasibility study" that preliminarily determines both what system upgrades are necessary to accommodate a

new interconnection and the requesting party's responsibility for those upgrade costs. Tariff Section 36.2. Next, PJM must conduct a "system impact study," which refines cost responsibility estimates for necessary system upgrades. Tariff Section 36.4.1. Customers may terminate or withdraw their interconnection requests based on the impact study's findings. PJM then conducts a final "facilities study" and makes its ultimate good faith estimate of the cost to be charged the interconnecting customer. Tariff Section 36.7.

By October 2003 PJM completed its initial second-phase study ("system impact"), estimating the cost of network upgrades due to Neptune's interconnection at $3.7 million. It soon revised that study because of the withdrawal of a higher-queued interconnection project; this revision, undisputed by Neptune, yielded a new estimate of $4.4 million. In March 2004, however, PJM informed Neptune that its system interconnection costs had to be restudied yet again on account of several generator retirements in the PJM system. PJM thus undertook a third restudy—and then a fourth. By June 2004 the estimate has risen to $26.3 million. (It appears undisputed that the withdrawal of generators may imply additional upgrade costs associated with an interconnection.) In September 2004, on account of further generator retirements, PJM informed Neptune of the need for a fifth system impact study. Neptune objected to the third, fourth, and fifth studies, but PJM refused to conduct a facility study (the third and final interconnection study step) or enter into an interconnection service agreement until it completed its fifth system impact study.

In December 2004, Neptune filed a complaint with FERC under § 206 of the Federal Power Act, 16 U.S.C. § 824e, asking it to compel PJM to move forward toward an interconnection service agreement based on the second system impact study. Without an interconnection service agreement,

Neptune was unable to secure construction financing in time to build needed facilities and meet a commitment to be operational by June 2007. Neptune sought expedited consideration.

In February 2005 the Commission granted Neptune's complaint, finding that PJM's final three restudies were not performed in accordance with its tariff. *Neptune Regional Transmission System, LLC v. PJM Interconnection, LLC*, 110 FERC ¶ 61,098 (2005) ("Complaint Order"). Noting that the PJM tariff was silent as to some aspects of the restudy issue and ambiguous as to others, *id*. at 61,404 P 21, the Commission interpreted the tariff to generally preclude restudies based on most events post-dating an interconnector's establishment of its place in the queue. It stressed the role of queue position in creating a coherent system for assigning interconnection costs and facilitating interconnection:

> [T]he queue position provides a potential customer a reasonable degree of certainty as to its financial costs. If an interconnection customer were to be held financially responsible for the costs of events occurring after its System Impact Study is completed it would be impossible for the customer to make reasoned business decisions. Instead, the customer would be susceptible to constant changes within the provider's system. . . . In fact, as in this case, there could be a never-ending series of changes, creating havoc for interconnection providers and customers alike.

*Id*. at 61,405 P 23. The Commission concluded that "cost allocations due to the announcements of generator retirements should have no bearing on the Facility Study [the third type of study]," and that "PJM should have provided to Neptune a Facility Study immediately upon the completion of its second System Impact Study." *Id*. at 61,406 P 29.

In reaching its decision, the Commission explicitly drew on "the principles of Order No. 2003," *id*. at 61,406 P 27, which it had adopted in 2003, well after its approval of the relevant language in PJM's tariff. See *Standardization of Generator Interconnection Agreements and Procedures*, Order No. 2003, 68 Fed. Reg. 49,846 (2003); see also *Notice Clarifying Compliance Procedures*, 106 FERC ¶ 61,009 (2004). The 2003 order limits restudy to three circumstances: (1) when a higher-queued project drops out of the queue, (2) when the modification of a higher-queued project is required, or (3) when the point of interconnection is re-designated. The restudies to which Neptune objected fell completely outside these exceptions. Order No. 2003's reasons for limiting restudy (and thus making queue position critical) were essentially the same practical considerations as the ones the Commission invoked here. See Complaint Order, 110 FERC at 61,404-405 P 22.

FERC deferred issues of classification and recovery of any costs above the $4.4 million interconnection costs to a later date, when transmission service was requested. *Id.* at 61,406 P 31. On petition for rehearing and clarification, the Commission "reaffirm[ed] that a project's queue position forms the basis for the determination of an interconnection customer's cost responsibilities," but said that costs above the $4.4 million appropriately charged to Neptune for interconnection "are solely reliability upgrade costs [and should be] allocated to Transmission Owners and then assigned to transmission customers" as specified in the PJM tariff. *Neptune Regional Transmission System, LLC v. PJM Interconnection, LLC*, 111 FERC ¶ 61,455 at 63,008 P 19 & 63,009 P 25 (2005) ("Rehearing Order"). Petitioners brought a timely challenge to the orders.

7

* * *

The Commission raises two preliminary objections to petitioners' challenge. First, it questions their standing, denying that they have suffered or are in imminent peril of suffering injury in fact—a concrete and particularized injury that is actual or imminent. See *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citations omitted). Second, FERC argues that petitioners' claims are unripe, asking us to evaluate "(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented." *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733 (1998). Standing and ripeness often overlap significantly, and they do here: As to both, we find FERC's arguments unavailing.

FERC's argument rests largely on its conclusion that costs above the $4.4 million identified in the second system impact study will be classified and recovered in future proceedings—that is, that their disposition has not been settled, making judicial review more appropriate at a future time, if and when those charges are assigned to petitioners. But the orders' effects on allocation of the costs above $4.4 million, however inconclusive, are only a part of their impact. As interconnection studies made under the tariff are paid for by the interconnecting party (as opposed to the RTO), see Tariff 41.4.3, at the very least FERC's orders conclusively shift the cost of any additional restudies away from Neptune and onto the RTO. Moreover, the orders effectively forced PJM into proceeding with the interconnection agreement and thus, inevitably, the interconnection. *Order on Unexecuted Service Agreements*, 111 FERC ¶ 61,456 (June 23, 2005). Both these aspects of FERC's order are enough for standing. They are equally sufficient to show ripeness. FERC has

suggested no institutional interests in postponing review of the restudy issue, and adjudication will not benefit from additional facts. A showing of hardship is therefore unnecessary. See *Sabre, Inc. v. DOT*, 429 F.3d 1113, 1120 (D.C. Cir. 2005) ("[A]bsent institutional interests favoring the postponement of review, a petitioner need not show that delay would impose individual hardship to show ripeness.").

\* \* \*

We review FERC's interpretation of tariffs in much the same way we apply deference under *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837, 842-43 (1984), to agency interpretations of statutes. *Koch Gateway Pipeline Co. v. FERC*, 136 F.3d 810, 814 (D.C. Cir. 1998). If the tariff language is unambiguous, we (unsurprisingly) follow it; if not, we defer to reasonable interpretations by the Commission. *Id*. at 814-15.

The language of the tariff tells us little. Section 41.4.3, entitled "Re-study," states simply that:

> If re-study of the System Impact Study is required, the Transmission Provider shall notify the Transmission Interconnection Customer in writing explaining the reason for the re-study and providing a scheduled completed date. Any cost of re-study shall be borne by the Transmission Interconnection Customer being restudied.

Complaint Order, 110 FERC at 61,405 P 25. This section tells us about the process for a restudy but says nothing about the circumstances permitting restudy. Given the section's focus, and its failure to mention generator retirements or any other possible occasion for restudy, it is of no consequence.

Section 42.2, on which the parties largely focus, is little more enlightening on the problem at hand:

> A Transmission Interconnection Customer shall be obligated to pay for 100 percent of the costs of the minimum amount of Local Upgrades and Network Upgrades necessary to accommodate its Transmission Interconnection Request and that would not have been incurred under the Regional Transmission Expansion Plan but for such Transmission Interconnection Request . . . .

Petitioners focus on the "but for" reference, and indeed do a good deal of rhetorical tub-thumping on the obviousness of its meaning. But the language establishes only a proposition on which all parties agree: that the subsection makes Neptune responsible for all costs of attachment and system upgrades that would not have been incurred "but for" the interconnection request. It says nothing directly about the time as of which "but for" causation should be assessed.

For this timing question, petitioners would draw the line at the signing of the interconnection service agreement because, they assert, this is the step in the process that definitively "locks in the actual cost of the upgrades" required to complete an interconnection. In contrast, FERC would draw the line much earlier in the process, when the interconnection customer has established its place in the interconnection queue, because that is the point at which requesting parties often make their business plans. At oral argument, Neptune, as intervenor, argued that FERC's position is buttressed by the text of § 42.2 because the provision holds Neptune responsible only for costs that would not have been incurred "but for [the] *Transmission Interconnection Request*," and it is that request which establishes a party's position in the queue.

We agree with FERC that the tariff language fails to resolve the issue. We therefore turn to whether the Commission's interpretation of the tariff was a reasonable one. As FERC emphasizes, its reading helps provide workability, certainty and predictability in the interconnection process. "If an interconnection customer is required to anticipate unspecified events occurring after its System Impact Study is completed, other than costs arising from changes from higher-queued generators, individual interconnection customers would be unable to make reasoned business decisions." Complaint Order at 61,405 P 23. Moreover, "[a]llowing repeated re-studies for possible speculative events occurring after a project joins the queue unfairly delays the ability of projects to receive financing and commence construction." Rehearing Order at 63,009 P 23. Petitioners' observation that the interconnection service agreement "locks in the actual cost" is in a sense true but in a more important sense circular. As time moves on data are commonly known with more precision, but the argument assumes that the costs to be "locked in" are those that the interconnection would cause if made in light of all events intervening between application and the agreement. But the Commission has offered concerns militating in favor of an earlier date—concerns that petitioners never confront, much less show to be so weightless as to render FERC's decision unworthy of deference. On this record, therefore, we can hardly say that the Commission's interpretation of the tariff was unreasonable.

Petitioners' opening brief points to the Commission's disregard of language in the PJM Manual that they say favors their view of the tariff, and to the Commission's reliance in the Complaint Order on the policy judgments the Commission made in Order No. 2003, which was adopted *after* it approved the tariff. But these problems (if they are problems) were

apparent as of the Complaint Order, yet petitioners failed to raise them in their petition for rehearing and clarification. Accordingly, the objections are barred by § 313(b) of the Federal Power Act, 16 U.S.C. § 825*l*(b). Cf. *Columbia Gas Transmission Corp. v. FERC*, 477 F.3d 739 (D.C. Cir. 2007). Petitioners argue in their reply brief that they couldn't have raised these issues on rehearing because the Complaint Order had "misled [them] into believing that the upgrades could still be charged to Neptune when it applied for transmission service." But the Complaint Order was perfectly clear on the relevant points: it rejected petitioners' theory as to the permissibility of restudies and it limited Neptune's responsibility for costs based on the interconnection process to the $4.4 million shown in the second system impact study. Accordingly, the Manual and Order No. 2003 issues are not before us.

\* \* \*

Petitioners raise one additional argument that requires comment—that FERC violated § 202 of the Federal Power Act by failing to provide appropriate notice of these proceedings to state commissions. Section 202 authorizes FERC "to divide the country into regional districts for the voluntary interconnection and coordination of facilities for the generation, transmission, and sale of electric energy," but requires that "[b]efore establishing any such district and fixing or modifying the boundaries thereof the Commission shall give notice to the State commission of each State situated wholly or in part within such district . . . ." 16 U.S.C. § 824a(a). Petitioners assert here that FERC's orders "*de facto* increased" PJM's geographic scope to include Long Island, New York, and did so without giving notice to all the state commissions participating in PJM and in the destination district.

It would be a stretch—and, as we shall see, too great a one—to say that petitioners made this argument below. Indeed, § 202 is mentioned below only in the request by petitioner Pennsylvania Public Utility Commission ("PaPUC") for rehearing; even there, the request merely noted the alleged error in a single opaque sentence:

> The Order has failed to afford the State commission of each affected state a reasonable opportunity to present their views and recommendations, and the Commission has failed to receive and consider such views and recommendations, contrary to Section 202 of the Federal Power Act, 16 U.S.C. § 824a.

PaPUC Request for Rehearing at 5. Petitioner made no argument to substantiate the allegation of error, never confronted the language of § 202, offered no analysis, and cited no legal authority (other than the stark reference to § 202). It therefore comes as no surprise that FERC dismissed the § 202 claim with little more than an observation that the participation of PaPUC and three other state agencies belied any notion that it had withheld notice or a reasonable opportunity to comment. Rehearing Order, 111 FERC ¶ 61,455 at 63,010 P 32.

Section 313(b) of the Federal Power Act, 16 U.S.C. § 825*l*(b), makes articulation of an "objection" on petition for rehearing a predicate to judicial review: "No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing." See also § 313(b)'s equivalent—§ 19(b) of the Natural Gas Act, 15 U.S.C. § 717r. In review of decisions of the Commission and its predecessor, we, of course, insist that a party claiming statutory error have identified the substance of the claim. See, e.g., *North Carolina v. Federal Power Comm'n*, 533 F.2d

702, 706 (D.C. Cir.) (declining to review alleged illegality of use of water for pollution dilution, and neglect of possible use of National Wild and Scenic Rivers System, for failure to articulate claim in petition for rehearing), vacated on other grounds, 429 U.S. 891 (1976). And in a case involving application of the "price squeeze" doctrine we established the proposition that "the Commission cannot be asked to make silk purse responses to sow's ear arguments." *City of Vernon v. FERC*, 845 F.2d 1042, 1047 (D.C. Cir. 1988).

The advent of heightened deference under *Chevron* sharpens the need for reasonable articulation of a statutory claim. Such articulation gives the agency an opportunity to respond and thus, guided by its familiarity with the statute and policy context, to exercise the discretion contemplated by *Chevron* to find a deference-worthy interpretation. Cf. *Rhode Island Consumers' Council v. Federal Power Comm'n*, 504 F.2d 203, 212 (D.C. Cir. 1974) ("The purpose of [§ 313(b)] is to insure that the Commission has an opportunity to deal with any difficulties presented by its action before the reviewing court intervenes."). But when a party advances a wholly undeveloped claim—as here—the agency has little occasion to present a reasoned explanation. Under these circumstances, full appellate review would unfairly undermine the agency's ability to rely on *Chevron* deference before an appellate court.

We note our practice in this court: When petitioners or appellants present no arguments to substantiate a claim of error, we normally decline to entertain the issue. See *Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983) ("[A]ppellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them. Thus, [the Federal Rules] require[] that the appellant's brief contain 'the contentions of the appellant with respect to the issues presented, and the reasons therefor, with citations to the

authorities, statutes and parts of the record relied on.' . . . [W]here counsel has made no attempt to address the issue, we will not remedy the defect . . . .") (internal citation omitted). Simply put, it is not "the court's duty to identify, articulate, and substantiate a claim for the petitioner." *National Exchange Carrier Ass'n v. FCC*, 253 F.3d 1, 4 (D.C. Cir. 2001).

The same hesitation to declare the law prematurely counsels against reading § 313(b) to allow petitioners' one-sentence cry of protest as an "objection" requiring an exegesis of § 202 from the Commission. Thus, finding PaPUC's inarticulate exclamation insufficient to satisfy § 313(b), we do not reach the merits.

In closing, we also note Neptune's argument that petitioners lack standing to raise the § 202 claim because PaPUC is a party to this proceeding and three more state agencies participated below. We need not reach the question of standing because our decision rests on a different "threshold, non-merits" ground. See *Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Co.*, 127 S. Ct. 1184 (2007); see also *Steel Co. v. Citizens for Better Environment,* 523 U.S. 83, 100-101 n.3 (1998) (holding that a federal court has leeway to choose among threshold grounds for declining to consider a case on the merits).

*Affirmed.*