# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued December 8, 2009   Decided January 29, 2010

No. 08-1199

CONNECTICUT DEPARTMENT OF
PUBLIC UTILITY CONTROL, ET AL.,
PETITIONERS

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

BRAINTREE ELECTRIC LIGHT DEPARTMENT, ET AL.,
INTERVENORS

———

On Petition for Review of Orders
of the Federal Energy Regulatory Commission

———

*Randall L. Speck* argued the cause for petitioners. With him on the briefs were *Harvey L. Reiter*, *Michael C. Wertheimer* and *John S. Wright*, Assistant Attorneys General, Attorney General's Office of the State of Connecticut, *Lisa Fink*, and *Bruce C. Johnson*.

*Lona T. Perry*, Senior Attorney, Federal Energy Regulatory Commission, argued the cause for respondent.

With her on the brief were *Cynthia A. Marlette*, General Counsel, and *Robert H. Solomon*, Solicitor.

*Scott H. Strauss*, *Jeffrey A. Schwarz*, *Jesse S. Reyes*, Assistant Attorney General, Attorney General's Office of the Commonwealth of Massachusetts, and *John P. Coyle* were on the briefs for intervenors Massachusetts Municipal Wholesale Electric Company, et al. in support of petitioners. *Joseph W. Rogers*, Assistant Attorney General, Attorney General's Office of the Commonwealth of Massachusetts, entered an appearance.

*Kenneth G. Jaffe*, *David B. Raskin*, *Elias G. Farrah*, *Mary E. Grover*, *Richard M. Lorenzo*, *Mary A. Murphy*, *Phyllis E. Lemell*, *G. Philip Nowak*, *C. Fairley Spillman*, *Wendy N. Reed*, and *Sonia C. Mendonca* were on the brief for intervenors transmission Owners in support of respondent. *Charles G. Cole*, *Alice E. Loughran*, and *Amanda M. Riggs* entered appearances.

Before: ROGERS and GARLAND, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

WILLIAMS, *Senior Circuit Judge*: In calculating the permissible return on equity for ISO New England, Inc., a regional organization of transmission owners, the Federal Energy Regulatory Commission explicitly hiked the rate in order to induce the ISO and its members to proceed swiftly in the completion of certain key transmission projects. It applied the incentive—a 100 basis point bonus in their return on equity—primarily to projects completed by December 31, 2008. Petitioners, mainly state utility regulators in New England, challenge the decision, arguing that the bonus, which

presumably will be paid by power consumers in New England, is contrary to applicable precedent, and arbitrary and capricious. We deny the petition.

\* \* \*

ISO New England, Inc., and owners of various New England transmission facilities, applied on October 31, 2003, to establish a new regional transmission organization ("RTO") in New England for the purpose of coordinating energy transmission in that area. Shortly after filing the application to establish the RTO, the transmission owners asked FERC to establish the return on equity percentage for transmission investments contemplated in the new RTO's expansion plan. Specifically, the RTO asked FERC to set a base return on equity, plus an incentive of 50 basis points (0.50%) to induce the utilities to join the RTO, and an additional incentive of 100 basis points (1%). FERC conditionally approved the RTO and the 50 basis point incentive for RTO participation. See *ISO New England Inc.*, 106 FERC ¶ 61,280 (2004); see also *Maine Pub. Utils. Comm'n v. FERC*, 454 F.3d 278 (D.C. Cir. 2006) (upholding the 50 basis point incentive).

As to the 100 basis point bonus, the Commission ordered a hearing before an administrative law judge, at which the transmission owners would be required to "demonstrate why the [100 basis point] adder is needed to incent investment in new transmission facilities and whether the adder should apply to all types of transmission expansion or be more narrowly focused on . . . innovative, less expensive technologies." *ISO New England*, 106 FERC ¶ 61,280, at P 249. Petitioners do not dispute the Commission's conclusion that even with the adder the total rate of return afforded to the transmission owners is within the range of reasonable returns. See *Bangor Hydro-Electric Co.*, 117

FERC ¶ 61,129, at P 19 (2006) ("Opinion No. 489") (calculating a zone of reasonable returns from 7.3% to 13.1%).

At the hearing, the transmission owners introduced expert testimony suggesting that the incentive, applied to the projects at issue before us, would cost customers $148.2 million in present value terms in the form of higher rates, but, by protecting customers from future reliability costs, would yield them benefits worth $76 million for each year by which the incentive accelerated the transmission projects' completion (putting aside "less easily quantified benefits").  Rebuttal Testimony of Michael M. Schnitzer, J.A. 567-77; see also *Bangor Hydro-Electric Co.*, 111 FERC ¶ 63,048, at PP 160-163 (2005).  (Petitioners do not attack the expert analysis, though they say it's largely irrelevant.)  Hence, in the transmission owners' view, the incentive would provide ratepayers an unequivocal net benefit if it accelerated completion of the projects by two years.  Nevertheless, another transmission owner expert witness conceded that the projects would be completed eventually whether or not they received an incentive. *Id.* at P 158.

The ALJ found this evidence inadequate to show a "need" for the adder within the meaning of the Commission's prior order as she understood it.  The evidence cited above, she said, did "not show that the adder will result in building of transmission that would otherwise not be built at all or that the . . . projects would [otherwise not] be built in a 'timely' manner." *Id.* at P 163.

The Commission reversed the ALJ, expressing the view that she had erred in requiring the utilities to show "that 'but for' the incentive, the projects at issue will not be built." Opinion No. 489, 117 FERC ¶ 61,129, at P 104.  Instead, the Commission described "the applicable standard [as] whether

(i) the proposed incentive falls within the zone of reasonable returns; and (ii) there is some link or nexus between the incentives being requested and the investment being made, *i.e.*, to demonstrate that the incentives are rationally related to the investments being proposed." *Id.* at P 105. (We will return to the Commission's "rationally related" standard, but we should say upfront that the Commission clearly did *not* mean the equivalent of the famously easy-going "rational basis review" that courts apply under some provisions of the Constitution.) The Commission found that its standard was met since "the proposed incentive will give project owners a significant impetus to push hard for their projects at all phases of the approval process." *Id.* at P 109.

On rehearing, the Commission limited the incentive to projects completed by December 31, 2008. *Bangor Hydro-Electric Co.*, 122 FERC ¶ 61,265, at PP 55, 64 (2008) ("Order on Rehearing"). Transmission owners with projects completed after that date must seek incentives on a case-by-case basis in their rate filings, following a procedure the Commission adopted in response to the Energy Policy Act of 2005, Pub. L. No. 109-58, § 1241, 119 Stat. 594, 961-62 (codified at 16 U.S.C. § 824s). See Order on Rehearing, 122 FERC ¶ 61,265, at P 63; see also Opinion No. 489, 117 FERC ¶ 61,129, at P 113 (noting that the incentive "is consistent with EPAct 2005 and [FERC's] final rule issued pursuant to EPAct 2005," i.e., *Promoting Transmission Investment Through Pricing Reform*, Order No. 679, 116 FERC ¶ 61,057, *order on reh'g*, 117 FERC ¶ 61,345 (2006)). After the petition for review was filed in this matter, the Commission granted a waiver of the December 31, 2008, cut-off date for certain projects. *See, e.g.*, *Bangor Hydro-Electric Co.*, 124 FERC ¶ 61,136, at P 26 (2008); *Northeast Utils. Serv. Co.*, 124 FERC ¶ 61,044, at P 63 (2008).

\* \* \*

Petitioners launch several attacks on the legal standard that FERC applied. They regard the "rationally related" nexus requirement as attenuated and vague; absent more specific criteria for ascertaining the presence or absence of the required nexus, they contend that the standard is not really a requirement at all. In their view, every transmission owner will be able to satisfy the nexus requirement and thus secure a 100 basis point adder up to the outer limit of the "zone of reasonableness."

We are sympathetic to petitioners' concern about the "rationally related" formulation's facial vagueness. But the Commission's application of the standard in this case belies the notion that it employed the phrase as a fig leaf for accepting any link, however nominal or trivial. Rather, FERC made findings—uncontested by petitioners—of the proposed projects' exceptional value under circumstances of congestion and unreliability. See Opinion No. 489, 117 FERC ¶ 61,129, at P 107 ("We begin with the observation that there is an undisputed need for the projects to which the proposed adjustment will apply . . . ."). The experts' calculation of dramatic savings from a mere two-year acceleration of the facilities' availability seems to confirm this sense of urgency. As we shall see, the Commission linked the urgency of bringing the projects on line to the incentive's likely tendency to speed up that event.

Petitioners contend that instead of simply requiring "nexus," the Commission should have required that the transmission owners demonstrate a "*causal* link between the incentive adder and any expected customer benefit," Petitioners' Br. at 43, as well as "a demonstrated need and identifiable benefits," *id.* at 45. This argument is inseparable from their contention that FERC lacked substantial evidence

that the proposed incentive would affect the transmission owners' conduct or benefit consumers.  Once we examine the Commission's goal in providing the adder, however, we see that it in effect did insist on evidence establishing the requisite causal link.

First, nothing in the law or FERC's stated purposes required FERC to adduce evidence, as petitioners occasionally suggest, "that the adder would produce new transmission investment."  Petitioners' Br. at 35; see also *id*. at  38 (arguing that the record indicates that the base rate of return "provided sufficient revenues to motivate the [transmission owners] to complete required new transmission" and that the incentive "would not increase transmission investment").  In fact the Commission made clear that it was concerned not with ensuring that the projects would be completed *eventually*, as the transmission owners' witness conceded they would be, but with ensuring that they would be completed *promptly*: "[T]he proposed incentive will give project owners a significant impetus to push hard for their projects at all phases of the approval process." Opinion No. 489, 117 FERC ¶ 61,129, at P 109.  Hence, we review the record to determine whether FERC had a reasonable basis for concluding that the incentive might benefit consumers by *accelerating* completion of the projects.  Thus the case is quite different from *New England Power Pool*, 97 FERC ¶ 61,093 (2001), which petitioners characterize as establishing a rule against "reward[ing] [utilities] for doing what [they are] supposed to do" anyway. *Id*. at 61,477.  Since the Commission was concerned in this case not just with ensuring completion of the projects but with accelerating completion, its decision is not inconsistent with *New England Power Pool*.

In an argument more attuned to the Commission's expressed goal, petitioners note that the transmission owners' own witnesses were unable to identify any particular action

that they would take if they received the incentive but that they would not take without it. See J.A. 205 ("I can't sit here and give you a shopping list now, looking forward, to exactly what we are going to do, specifically in response to this incentive."). But in fact FERC did adduce substantial evidence for the proposition that the incentive was likely to increase the speed with which projects are completed. Noting the expert testimony in the record, the Commission found that "utilities can be expected to respond to financial motivations and, in so doing, to expend the time and effort necessary to sell the importance of their projects at the local level." Opinion No. 489, 117 FERC ¶ 61,129, at P 109.

The idea that firms respond to financial incentives is, of course, hardly revolutionary; such cases as *Maine Pub. Utils. Comm'n v. FERC*, 520 F.3d 464 (D.C. Cir. 2008), *rev'd in part on other grounds sub nom. NRG Power Mktg. v. Maine Pub. Utils. Comm'n*, No. 08-674, 2010 WL 98876 (U.S. Jan. 13, 2010), understandably take the proposition for granted. There may be situations, to be sure, where circumstances somehow block standard incentive effects. But there is no indication that this is one of them.

Certainly the Commission's failure to pinpoint specific actions that utilities would take only because of the incentive is of no moment. In *Public Utilities Comm'n of Cal. v. FERC*, 367 F.3d 925, 928-29 (D.C. Cir. 2004), for example, we approved incentives that FERC had provided for western transmission owners in order to accelerate their provision of new facilities aimed at reducing congestion and congestion costs; we did not suggest any need for evidence of the precise steps the incentives would bring about. And in *In re Permian Basin Area Rate Cases*, 390 U.S. 747 (1968), in approving the Commission's two-tier system for wellhead pricing of natural gas dedicated to the interstate market, the Court plainly did not require a showing of exactly what wells would be drilled

in response to higher prices. *Id*. at 765-99. *Farmers Union Cent. Exch. v. FERC*, 734 F.2d 1486 (D.C. Cir. 1984), cited by petitioners for its language faulting the Commission for failing to "attempt to calibrate the relationship between increased rates and the attraction of new capital," *id.* at 1503, imposed no such requirement (assuming we can substitute precise forms of acceleration for the "new capital" at issue there). We made the remark in rejecting FERC's idea that the statute allowed it to set rates "at levels so high that they would seldom be reached in actual practice." *Id.* at 1503 (internal quotation marks omitted). We obviously did not purport to overturn, for example, the Supreme Court's less demanding view of conventional ratemaking. See, e.g., *Mobil Oil Corp. v. Federal Power Comm'n*, 417 U.S. 283, 318 (1974) ("It is true that the Commission concluded that it could not determine the precise amount of additional gas supply that would be found and dedicated to interstate sales as a result of this formula. But this was also true of any change it might have made in gas prices.").

In their reply brief petitioners turn to a specific reason why the adder would not bring on the hoped for effects. They suggest that the Commission undercut any such tendency by its readiness to allow at least some of the utilities to include the accrued costs of "construction work in progress" or "CWIP" in their rate base. See Petitioners' Reply Br. at 6 n.2 (citing *United Illuminating Co.*, 119 FERC ¶ 61,182 (2007)). It is true that deferring inclusion in the rate base until project completion might have given the utilities a sharper incentive, because they would have started to earn the higher rate of return on a project only when it was finished and brought into service. But even to the extent that utilities are permitted to put CWIP into the rate base, they can do so only by incurring the relevant expenses and filing a new rate schedule to reflect the added sums. See 18 C.F.R. § 35.25(c). Thus CWIP hardly nullifies the adder's incentive effects.

Also in the reply brief petitioners argue that the adder enables the utilities to maximize their profits by "increasing the capitalized cost of the project in order to recover the enhanced [rate of return] on a larger base amount." Petitioners' Reply Br. at 6. Here petitioners allude to the familiar Averch-Johnson effect, as to which they submitted expert testimony. See Testimony of David W. Savitsky, J.A. 256-57. The Commission's order in fact discussed this issue, expressing confidence that "the approval process itself [including approval by ISO New England] and its focus on 'necessary' additions," gave reasonable assurance against "over-building." Opinion No. 489, 117 FERC ¶ 61,129, at P 123.

Petitioners are in the curious position of arguing on the one hand that the Commission should give incentives only if it can identify each "incented" act and how the utility's behavior would differ from what it would have been absent the incentive—a task of positively heroic monitoring, indeed anticipatory monitoring—but on the other hand that the Commission erred in placing confidence in its ability to monitor past expenditures for reasonableness. Petitioners fail to explain just what is arbitrary or capricious about the Commission's refusing the first burden and accepting the second.

We note that petitioners' "causal link" argument might be thought to suggest that the Commission should have applied a de facto cost-benefit analysis to the adder and demanded proof that the incremental cost of the adder would be matched by at least equivalent incremental benefits for the customers (see, e.g., the apparent demand for "symmetry" between the incentive payment and the resulting benefits, Petitioners' Br. at 43). But there is no trace of a proposal for cost-benefit analysis in the Petition for Rehearing, which alone would

defeat our jurisdiction to review it, see 16 U.S.C. § 825*l*(b), and even here petitioners barely hint at such an argument.

Petitioners also argue that, to the extent that FERC invoked the desirability of helping the utilities to obtain favorable financing terms as a justification for the incentive, the favorable financing will benefit only the transmission owners' shareholders, not customers. Petitioners fault FERC for failing to explain "how customers derive any, material incremental benefit" from more favorable financing. Petitioners' Reply Br. at 23-24. Petitioners' assertion appears to assume that the Commission was considering only the utilities' equity returns, not their debt costs; further, full evaluation would require inquiry into the impacts of agency rate-setting on stock market performance and vice versa. But petitioners failed adequately to raise this issue in their Petition for Rehearing, referring only in a general way to their assertion that the Commission had not identified adequate customer benefits. See J.A. 408. We therefore do not have jurisdiction to consider the argument. As we have said, the Commission adequately responded to the general argument by pointing to the benefits of accelerating a reduction in congestion and an increase in reliability.

Another argument that fails for want of jurisdiction is the claim that the Commission's "rational relation" standard impermissibly deviated from its own prior formulae. The closest petitioners came to raising such an issue in the Petition for Rehearing was a quotation from the dissenting Commissioner's claim, "I cannot conceive of a case in which an applicant would ever be denied an incentive under the majority's *new* standard." J.A. 407 (emphasis added) (internal quotation marks omitted). But in context they appeared to use the statement only as support for their claim that the Commission's criteria were generally too lax. They did not

otherwise develop the issue. Cf. *Pub. Serv. Elec. & Gas Co. v. FERC*, 485 F.3d 1164, 1170 (D.C. Cir. 2007).

Finally, amici question the Commission's use of a "reliance" rationale in the rehearing order. Recognizing in the rehearing order that since issuing Opinion No. 489 in this case it had articulated a slightly different and arguably more demanding standard for granting incentive adders, see Order No. 679, 116 FERC ¶ 61,057, *order on reh'g*, 117 FERC ¶ 61,345, the Commission required transmission owners to follow the new standard for projects completed after December 31, 2008; for projects completed prior to that date, it granted the incentive based on the existing record. It justified the incentive for pre-2009 projects in part on the basis of the "project owners' reasonable reliance" on their already-filed rates. Order on Rehearing, 122 FERC ¶ 61,265, P 55. Amici claim a lack of any evidence that the transmission owners actually relied on their filings and argue that any such reliance would not have been reasonable.

But the Commission's decision makes clear that it was in fact principally concerned with the administrative burden that would result for both it and the transmission owners from reconsidering the decision under the new standard, not with reliance as such. See *id.* at P 70 (noting that holding a new hearing under the new standard "would be an administrative burden on the Commission and on the parties" and "would also create unnecessary confusion and uncertainty"). Given that, as the Commission observed, "an ROE incentive is not susceptible to a precise calculation," *id.* at P 71, it was reasonable to conclude that any gain from evidence that might have been obtained on remand would not improve the decision-making process enough to justify the burden of doing so.

The petition for review is therefore

*Denied.*