# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued March 25, 2013          Decided May 10, 2013

No. 11-1471

SOUTHERN CALIFORNIA EDISON COMPANY,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

CALIFORNIA DEPARTMENT OF WATER RESOURCES, ET AL.,
INTERVENORS

On Petition for Review of Orders of
the Federal Energy Regulatory Commission

*Charles G. Cole* argued the cause for petitioner. With him on the briefs were *Gary A. Morgans*, *Linda C. Bailey*, and *Jill C. Maguire*. *Anna J. Valdberg* entered an appearance.

*Samuel Soopper*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief was *Robert H. Solomon*, Solicitor.

*Peter J. Scanlon*, *Joshua E. Adrian*, *Bonnie S. Blair*, *Peter C. Kissel*, *Elisa J. Grammar*, *Philip W. Mone*, *Margaret E. McNaul*, *Rebecca L. Sterzinar*, *Sean M. Neal*, *Seth T. Lucia*, *Kamala D. Harris*, Attorney General, Office of the Attorney

General for the State of California, *Kathleen A. Kenealy*, Senior Assistant Attorney General, *Frank R. Lindh*, *Harvey Y. Morris*, *Gregory Heiden*, *Joseph B. Nelson*, *Michael Postar*, and *Bhaveeta K. Mody* were on the brief for intervenors California Department of Water Resources, et al. in support of respondent. *Lisa S. Gast* and *Natalie M. Karas* entered appearances.

Before: ROGERS, *Circuit Judge*, and GINSBURG and SENTELLE, *Senior Circuit Judges*.

Opinion for the Court by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: Before the court is a challenge to the regulatory mechanism for the recovery by an investor-owned public utility of the cost of three transmission projects in its transmission rates. In 2007, the Federal Energy Regulatory Commission granted various rate incentives to encourage the construction of three projects by the Southern California Edison Company ("SoCal Edison"). The beneficial rate treatment included incentives to be added to a base rate of return for the projects. Later that year, SoCal Edison filed revisions to its transmission tariff, pursuant to section 205 of the Federal Power Act ("FPA"), 16 U.S.C. § 824d, to reflect changes to its transmission revenue requirements and rates, implementing the rate incentives and proposing a base return on equity ("ROE").

The Commission concluded that SoCal Edison's base ROE should be set at the median, rather than the midpoint as SoCal Edison proposed, of the range established by a proxy group of publicly-traded companies, and that the ROE for the locked-in period (March 1, 2008 to December 31, 2008, when the rate at issue was in effect) should be updated to reflect the most recently available financial data, based on the average yields on ten-year U.S. Treasury bonds. SoCal Edison challenges the Commission's use of the median as contrary to FPA § 205, its

updating without considering proffered evidence as contrary to 5 U.S.C. § 556(e), and both its use of the median and its updating of the ROE for the locked-in period as arbitrary and capricious. We deny the petition as to the Commission's methodology for measuring the ROE, and we grant the petition and remand in view of the Commission's failure to comply with 5 U.S.C. § 556(e) when it updated the ROE with information outside the record.

**I.**

In order to attract capital investment for construction of transmission facilities, a utility must offer a risk-adjusted expected ROE sufficient to attract investors. *See Canadian Ass'n of Petroleum Producers v. FERC*, 254 F.3d 289, 293 (D.C. Cir. 2001). To calculate the ROE, the Commission "measures the return enjoyed by the company's equity investors by the discounted cash flow ('DCF') model, which assumes that a stock's price is equal to the present value of the infinite stream of expected dividends discounted at a market rate commensurate with the stock's risk." *Id.* When a utility is not publicly traded, key values needed to calculate the ROE are missing, and the Commission must resort to more roundabout estimations, including relying on the ROEs of comparable publicly-traded companies, termed a proxy group. *See Pub. Serv. Comm'n of Ky. v. FERC*, 397 F.3d 1004, 1006–07 (D.C. Cir. 2005) ("*Midwest ISO*"); *Canadian Ass'n*, 254 F.3d at 293–94. Adjusting that range by applying screens to exclude unrepresentative high or low rates of return, *see Canadian Ass'n*, 254 F.3d at 294, the Commission assembles a zone of reasonable ROEs on which to base a utility's ROE. Pursuant to the Energy Policy Act of 2005, the Commission has also established incentive-based rate treatments to further encourage the construction of transmission facilities and replacement of aging transmission infrastructure. *See* 16 U.S.C. § 824s;

*Promoting Transmission Investment Through Pricing Reform*, Order No. 679, 71 Fed. Reg. 43,294 (July 20, 2006), *order on reh'g*, Order No. 679-A, 72 Fed. Reg. 1152 (Dec. 22, 2006), *order on reh'g*, 119 FERC ¶ 61,062 (2007).

In November 2007, the Commission approved incentive rate treatment for SoCal Edison's construction of three transmission projects, including rate adders of 0.75% for the Rancho Vista Project, 1.25% for the Devers-Palo Verde II ("DPV2") and Tehachapi Projects; 0.50% across the board for joining the California Independent System Operator; and 100% recovery for Construction Work In Progress ("CWIP") for the projects. *S. Cal. Edison Co.*, Order Granting Petition for Declaratory Order, 121 FERC ¶ 61,168 (2007) ("*Incentives Order*"), *reh'g denied*, 123 FERC ¶ 61,293 (2008). The following month, SoCal Edison filed revisions to its transmission tariff, pursuant to FPA § 205, to implement the *Incentives Order* and propose a base ROE of 11.5% for the three transmission projects, which were estimated to have capital expenditures of approximately $2.5 billion, *see Incentives Order*, 121 FERC at ¶ 61,753. SoCal Edison followed the DCF methodology, screened a national proxy group, and proposed a base ROE of 11.5% by reference to the midpoint (12.07%) of that group. It calculated total ROEs, including incentives, that ranged from 12.75% to 13.25%: 12.75% for the Rancho Vista Project and 13.25% for both the DPV2 and Tehachapi Projects.

The Commission accepted the tariff revisions subject to conditions, preliminarily determined (using a different proxy group and screening criteria than in SoCal Edison's application) that the zone of reasonableness ranged from 7.97% to 13.67% (putting SoCal Edison's proposed overall ROEs within the upper end), and ordered a paper hearing to allow all parties to "present evidence to rebut the proposed ROE determination." *S. Cal. Edison Co.*, Order Accepting Tariff Revisions, Subject to

Conditions and Establishing Paper Hearing, 122 FERC ¶ 61,187, ¶ 62,069 (2008). The California Public Utilities Commission sought rehearing and, as relevant, also commented in the Paper Hearing that the Commission should update the ROE based upon changes in the ten-year U.S. Treasury bond rate, as it had done in the past. The California Department of Water Resources commented in part that the Commission should use the median, not the midpoint, in determining the ROE. Six California cities urged, in protests, updating and use of the median. SoCal Edison responded that the midpoint, not the median, was consistent with a long line of Commission precedent for determining the ROE for electric utilities and was appropriate for its base ROE, as well as that Commission hints of a change of policy without explanation were arbitrary and capricious. SoCal Edison, offering expert testimony of Dr. Paul T. Hunt, argued that the midpoint emphasizes the range of the proxy group returns, the median causes distortions because it disregards that range, and the median produces lower ROEs thereby undermining the goal of Congress and the Commission of expanding the transmission grid. It also urged the Commission to use proxy group data as of November 30, 2007 and not to use more recent data or update the ROE based upon the ten-year Treasury bond yields.

The Commission was not persuaded by SoCal Edison's arguments. Upon consideration of comments submitted at the Paper Hearing, the Commission determined the appropriate proxy group, found that the zone of reasonableness was between 7.80% and 16.19%, and set SoCal Edison's base ROE at the median of that zone, 10.55%. *S. Cal. Edison Co.*, Order on Paper Hearing and Request for Rehearing, 131 FERC ¶ 61,020, ¶¶ 61,141, 61,145-47 (2010) ("*Paper Hearing Order*"). It also updated the ROE for the locked-in period (March 1, 2008 to December 31, 2008) when the rate at issue was in effect, relying on extra-record data, to reflect a 1.01% reduction in the ten-year

U.S. Treasury bond yields and so reducing SoCal Edison's base ROE from 10.55% to 9.54%. *Id.* at ¶¶ 61,147-48. The Commission denied rehearing. *S. Cal. Edison Co.*, Order on Rehearing and Clarification, 137 FERC ¶ 61,016 (2011) ("*Rehearing Order*").[1]

**II.**

SoCal Edison's challenge to the Commission's use of the median, instead of the midpoint, to measure the base ROE of a single electric utility of average risk includes a statutory argument that effectively devolves into an argument that the Commission's use of the median was arbitrary and capricious. However viewed, SoCal Edison's contentions face an uphill battle. As the Supreme Court has observed, "[t]he statutory requirement that rates be 'just and reasonable' is obviously incapable of precise judicial definition, and we afford great deference to the Commission in its rate decisions." *Morgan Stanley Capital Grp., Inc.*, 554 U.S. 527, 532 (2008) (citations omitted). Under the deferential arbitrary and capricious standard, 5 U.S.C. § 706(2)(A), the court will "affirm the Commission's orders so long as [it] examined the relevant data and articulated a . . . rational connection between the facts found and the choice made. In matters of ratemaking, our review is highly deferential, as issues of rate design are fairly technical and, insofar as they are not technical, involve policy judgments

---

[1] The *Rehearing Order* also addressed SoCal Edison's challenges to two other Commission orders requiring it to use the median in setting its ROE, *S. Cal. Edison Co.*, Order Accepting and Suspending Proposed Rates and Establishing Hearing and Settlement Judge Proceedings, 133 FERC ¶ 61,269 (2010), and *S. Cal. Edison Co.*, Order Accepting and Suspending Proposed Formula Rate Filing and Establishing Hearing and Settlement Judge Procedures, 136 FERC ¶ 61,074 (2011). *Rehearing Order*, 137 FERC ¶ 61,016.

that lie at the core of the regulatory mission." *Sacramento Mun. Util. Dist. v. FERC*, 616 F.3d 520, 528 (D.C. Cir. 2010) (citation, quotation marks, and alterations omitted). This court's "scrutiny is limited to ensuring that the Commission has made a principled and reasoned decision supported by the evidentiary record." *Complex Consol. Edison Co. of N.Y., Inc. v. FERC*, 165 F.3d 992, 1000–01 (D.C. Cir. 1999) (citation omitted).

Under FPA § 205(e), 16 U.S.C. § 824d(e), "the burden of proof to show that the increased rate or charge is just and reasonable shall be upon the public utility." The Commission, however, must "approve th[e increase] as long as the new rates are 'just and reasonable.'" *Wis. Pub. Power, Inc. v. FERC*, 493 F.3d 239, 254 (D.C. Cir. 2007) (citation omitted); *see Atl. City Elec. Co. v. FERC*, 295 F.3d 1, 9 (D.C. Cir. 2002). SoCal Edison therefore contends that "if a utility proposes use of the midpoint in a Section 205 filing and the use of the midpoint is just and reasonable, then under the statute [the Commission] must accept it." Pet'r's Br. 25. By SoCal Edison's reading, the Commission did not conclude in the challenged orders that it had failed to prove the midpoint was just and reasonable, and under the FPA without so concluding the Commission could not reject its proposed rate. *See id*. at 25–28.

The Commission rejected SoCal Edison's midpoint-based ROE upon concluding that for a single electric utility of average risk "the best measure of central tendency is the median," *Paper Hearing Order*, 131 FERC at ¶ 61,147, and stating that it was "not persuaded that our established procedures for determining a[] ROE for a utility of average risk are not just and reasonable for setting SoCal Edison's ROE," *Rehearing Order*, 137 FERC at ¶ 61,068. SoCal Edison correctly points out that the Commission did not expressly state that its use of the midpoint was not just and reasonable, but neither has this court required the Commission to do so with respect to a component of a

proposed rate.  To the extent SoCal Edison maintains that a "just and reasonable" rate is a zone and not a point, suggesting that there is room for both the midpoint and the median to meet the statutory standard, *see* Pet'r's Br. 26, whether any space exists between the median being just and reasonable and the midpoint *not* being so is a subset of the question of what rate is "just and reasonable."   And SoCal Edison's counsel understandably acknowledged that the Commission has discretion regarding the methodology by which it determines whether a rate is just and reasonable.  *See* Oral Arg. Tr. at 5; *Fed. Power Comm'n v. Hope Natural Gas Co.*, 320 U.S. 591, 602 (1944).

Despite SoCal Edison's use of cherry picked phrases from the *Paper Hearing Order* to imply that the Commission simply chose the median as "preferable," 131 FERC at ¶ 61,145, and not because the midpoint-based ROE SoCal Edison proposed was *not* "just and reasonable," Reply Br. 4, the Commission did not hold SoCal Edison to a higher standard than the FPA requires.  Rather, the Commission concluded that the median methodology was preferable and it may, consistent with the FPA,  reject a utility's proposed methodology without assessing the justness or reasonableness of that methodology.  In order to discharge its statutory duty of ensuring that "[a]ll rates . . . [are] just and reasonable," 16 U.S.C. § 824d(a), the Commission may require the use of a particular ratemaking methodology so long as its embrace of that methodology is not arbitrary and capricious.   The Supreme Court explained in *Hope Natural Gas*, "[u]nder the statutory standard of 'just and reasonable' it is the result reached not the method employed which is controlling" and "infirmities" in Commission methodology are "not . . . important," provided that "the total effect of the rate order cannot be said to be unjust and unreasonable."  320 U.S. at 602 (citations omitted).  Indeed, SoCal Edison essentially concedes in footnote 2 of its Reply Brief that its statutory argument collapses into its argument that the Commission's use

of the median for a single electric utility of average risk is arbitrary and capricious because the Commission has previously determined, and this court has affirmed, that the midpoint is a just and reasonable measure of the ROE for a group of electric utilities with diverse risk profiles. This it fails to show, in part because the Commission's "endorsement of the median of the proxy group results produced by the DCF methodology to determine an individual electric utility's ROE represents the logical development of [the Commission's] ROE policy over the past fifteen years." Intervenors' Br. 9.

Under the Natural Gas Act, the Commission has long used the median to set the ROE. In *Transcontinental Gas Pipe Line Corp.*, 84 FERC ¶ 61,084 (1998), the Commission concluded that for a company of average risk, the ROE should be set at the median because doing so "giv[es] consideration to more of the companies in the proxy group, rather than only those at the top and the bottom," and "will lessen the impact of any single proxy company whose ROE is atypically high or low." Following a remand in *Canadian Association*, 254 F.3d 289, the Commission elaborated the median's "important advantages over the mean and midpoint approaches in determining central tendency," *Northwest Pipeline Corp.*, 99 FERC ¶ 61,305, ¶ 62,276 (2002), specifically noting that the median best represents central tendency in a skewed distribution, is less affected by extreme numbers than the midpoint, and aids the Commission's effort to treat all companies of average risk equally.

By contrast, until 2008, the Commission used the midpoint to establish the ROE for both individual electric utilities of average risk, *see, e.g.*, *Consumers Energy Co*., 98 FERC ¶ 61,333 (2002), and diverse-risk electric utilities filing jointly, *see, e.g.*, *Midwest Indep. Transmission Sys. Operator, Inc.*, 106 FERC ¶ 61,302 (2004) ("*Midwest ISO*"). In determining the ROE for "a broad group of [electric] utilities with diverse risks

and business profiles," the Commission explained that it used the midpoint because "[s]electing the most refined measure of central tendency, as might be achieved with use of the median, is not the Commission's goal in [such a] case, given that [it is] not selecting a ROE for a single utility of average risk." *Midwest ISO*, 106 FERC at ¶ 62,192. Rather, in selecting the ROE for a diverse set of electric companies "the range of results becomes as important as the central value," and the midpoint, "unlike the other measures of central tendency," fully considers that range. *Midwest ISO*, 397 F.3d at 1010.

In 2008, the Commission announced in *Golden Spread Electric Coop., Inc.*, 123 FERC ¶ 61,047 (2008), that it would use the median as the measure of the ROE for a single electric utility of average risk. Drawing on the distinction identified in *Midwest ISO*, and the advantages of using the median noted in *Transcontinental Gas*, the Commission observed that, although there were no concerns of extremes in that case, "using the median also has the advantage of taking into account more of the companies in a proxy group rather than only those at the top and bottom." *Id.* at ¶ 61,1247. Since then, the Commission has continued to use the median to set the ROE for electric utilities filing individually. *See, e.g.*, *Pub. Serv. Co. of N.M.*, 142 FERC ¶ 61,168 (2013); *Pac. Gas & Elec. Co.*, 141 FERC ¶ 61,168 (2012); *Pub. Serv. Co. of N.M.*, 137 FERC ¶ 61,119 (2011); *Pioneer Transmission, LLC*, 126 FERC ¶ 61,281 (2009); *Va. Elec. & Power Co.*, 123 FERC ¶ 61,098 (2008). It has continued, however, using the midpoint for electric utilities applying jointly as a regional group.

This is the first time a challenge to the Commission's use of the median for an individual electric utility of average risk has come before the court. SoCal Edison contends that the Commission still has provided an inadequate justification for its policy change. Essentially, SoCal Edison maintains that it is

arbitrary and capricious for the Commission to "treat[] the same utility—with the same risk profile—differently, depending upon the context in which the utility files a[] ROE application" (singly or as part of a group) since "this context does not in any way affect the ROE that a utility needs to earn in order to attract investors, maintain a reliable energy infrastructure, and serve its customers." Pet'r's Br. 19. The record shows that the Commission has not "glosse[d] over or swerve[d] from prior precedents without discussion [so as to] cross the line from tolerably terse to intolerably mute." *W & M Props. of Conn., Inc. v. NLRB*, 514 F.3d 1341, 1347 (D.C. Cir. 2008) (citation and quotation marks omitted). Nor has it failed to conform to the requirement of *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514–16 (2009), that it acknowledge its change and provide a reasoned explanation for it.

In the *Paper Hearing Order*, the Commission explained why it had changed its policy for an individual electric utility:

> [W]hile SoCal Edison is correct that the Commission has traditionally used the midpoint for setting the ROE in electric proceedings and the median in gas proceedings, as the electric and gas industries have evolved, the Commission finds that, when establishing the ROE of an individual utility, there is *no longer a sufficient basis for divergent approaches* to determining the middle of the range of reasonable returns in the gas and electric industries. Rather, the Commission finds that here, the median is appropriate because it is the *most accurate measure of central tendency* for a single utility of average risk, such as SoCal Edison.

131 FERC at ¶ 61,147 (emphases added). (As intervenors note, the gas industry restructuring preceded the electric industry

restructuring by a number of years. *See* Intervenors' Br. 11–12 & n.10 (citing *Transmission Access Policy Study Grp. v. FERC*, 225 F.3d 667, 681–83 (D.C. Cir. 2000), *aff'd sub nom. New York v. FERC*, 535 U.S. 1 (2002))). Looking to its gas cases such as *Transcontinental Gas* and *Northwest Pipeline* to explain the "benefits of using the median rather than the midpoint to set the ROE for a company of average risk," the Commission concluded that the median was the "most accurate measure" for a ROE for a single electric utility of average risk. *Paper Hearing Order*, 131 FERC at ¶¶ 61,145–47. It gave three principal reasons: (1) "[T]he median lessens the impact of atypical outliers in the proxy group," *id.* at ¶ 61,145; (2) The median "gives consideration to more of the companies in the proxy group, rather than only those at the top and bottom," *id.* (citation and quotation marks omitted); and (3)

> "The laws of statistics support the Commission's use of the median in setting [the] ROE for a company facing average risk because it has important advantages over the mean and midpoint approaches in determining central tendency. The median best represents central tendency in a skewed distribution over the mean because the latter is drawn in the direction of the skew more than the median. That is, in a very positively skewed distribution, the mean will be higher than the median. In a very negatively skewed distribution, the mean will be lower than the median. These statistical facts make the median an appropriate average to use to represent the typical observation in a skewed distribution because it is less affected by extreme numbers than the mean. Similarly, the median is also less affected by extreme numbers than the midpoint in a skewed distribution. Since the midpoint is the average of the highest and lowest numbers in the

group, it is clearly subject to distortion by extremely high or low values."

*Id.* at ¶¶ 61,145–46 (quoting *Northwest Pipeline*, 99 FERC at ¶ 62,276). The Commission stated as well that "the median is preferable to the midpoint or mean because it aids the Commission in its effort to treat all companies that face average risk equally." *Id*. at ¶ 61,145.

Given these reasons and the evolution of the gas and electric industries, the Commission concluded in the *Paper Hearing Order* that "when establishing the ROE of an individual utility, there is no longer a sufficient basis for divergent approaches to determining the middle of the range of reasonable returns in the gas and electric industries." *Id*. at ¶ 61,147. The Commission distinguished cases cited by SoCal Edison as involving either a diverse group of utilities, *id*. ¶ 61,146 (citing, e.g., *Devon Power Co.*, 104 FERC ¶ 61,123 (2003)), or cases in which "the issue of how to determine the middle of the range when setting the ROE for a single utility of average risk was not specifically raised by the parties or addressed by the Commission," *id*. (citing, e.g., *Norwalk Power, LLC*, 120 FERC ¶ 61,048 (2007)). SoCal Edison continues to rely on these cases in its brief to no avail, for reasons the Commission identified. And the Commission explained that its prior cases that had distinguished "between the gas and the electric industries with regard to the DCF analysis . . . pertained to the differences in the relative growth rates of each industry, and not to the measure of central tendency." *Id*.

The Commission also explained that its decision to apply the midpoint in *Midwest ISO* occurred in the "unique circumstances" in which "the ROE was going to apply to a diverse group of companies, rather than to a single company of average risk, [and so] it was important to consider the entire

range of results yielded by the proxy group." *Id.* In those circumstances, it was "less concerned about distortions that may occur because of the highest or lowest number," and "instead, it must ensure that the base ROE sufficiently supports the entities that have ventured into the [Regional Transmission Organization] membership and that [the base ROE] results in a reasonable rate of return as applied to all the companies in the group." *Id.* The Commission emphasized that "the median places more weight on the middle values of a range of values than does the midpoint, and thus, it potentially produces a value that is not appropriate for a diverse group of utilities." *Id.* It underscored that "it was not seeking the most refined measure of central tendency, which might be achieved with the median, because it was not establishing a[] ROE for a single company of average risk." *Id.* ¶ 61,147.

On rehearing, the Commission reaffirmed that its approach of using the median "recognizes important differences in the purpose of the analysis that the Commission conducts when it sets a[] ROE for an individual utility rather than for a group comprising all of the utilities within an [Independent System Operator]." *Rehearing Order*, 137 FERC at ¶ 61,068. That is, when setting the "ROE for an individual utility, [its] analysis is designed to address the risks of the individual utility," *id.* whereas with a group of utilities with differing risks and business profiles, *see id.* ¶ 61,069, the goal is "not to select the most refined measure of central tendency, as is the case when . . . setting a[] ROE for a single utility of average risk," *id.* The Commission emphasized that in explaining its use of the midpoint in *Midwest ISO*, it had stated that it was not considering "what constitutes the best overall method for determining ROE generically (i.e., the midpoint versus the median or mean)," but only in the unique circumstances of setting the ROE for a diverse group of transmission owners. *Id.* (citation and quotation marks omitted).

Absent continuing reasons to treat the electric and gas industries differently, the Commission identified its changed policy and provided principled reasons for using the median to establish SoCal Edison's base ROE. The Commission was under no obligation to "demonstrate . . . that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates." *Fox Television*, 556 U.S. at 515. The challenged orders reflect that belief for the use of the median to measure the ROE for a single electric utility of average risk.

Contrary to SoCal Edison's position, the Commission did not apply "different standards to similarly situated entities and fail[] to support this disparate treatment with a reasoned explanation and substantial evidence in the record." *Burlington N. & Santa Fe Ry. Co. v. Surface Transp. Bd.*, 403 F.3d 771, 777 (D.C. Cir. 2005). The Commission instead explained how its different purposes determine its different approaches when setting the ROE for a single electric utility as opposed to a group of utilities with diverse risk profiles. As described, the Commission's "goal in setting a[] ROE for a group comprising all members of a[] [Regional Transmission Organization] is not to select the most refined measure of central tendency, as is the case when the Commission is setting a[] ROE for a single utility of average risk," *Rehearing Order*, 137 FERC at ¶ 61,069, because in the context of a diverse group of companies the Commission is "not as concerned" that "the high or low results represent different risks from the single company," *id*. (citation and quotation marks omitted); *see* Intervenors' Br. 22–24. Rather, it must ensure that the ROE results in a reasonable rate of return as applied to all of the utilities in the group. *See Paper Hearing Order*, 131 FERC at ¶¶ 61,146–47.

Likewise, SoCal Edison's assertion that it and individually filing electric utilities generally are disadvantaged by the Commission's use of the median instead of the midpoint does not withstand scrutiny. In *Midwest ISO*, the court stated:

> If FERC's orders premised a policy of using the midpoint on an effort to obtain the highest rate of return, the orders could not withstand APA review. This is because there would be no logical connection between the rationale and the result: nothing about the midpoint ensures it will be higher than the median or the mean in any particular case. Of course, FERC could have explained that it would always choose the measure that yields the highest result, and tried to defend that rationale here. But the Commission cannot justify a *commitment to the midpoint* on the ground that it produced the highest return, because that is pure happenstance.

397 F.3d at 1011. So too here. Nothing about the midpoint ensures that it will be higher than the median in any particular instance, as SoCal Edison's own expert confirms, *see* Prepared Supplemental Testimony of Dr. Paul T. Hunt at 21 (May 2, 2008). So the use of the median does not necessarily disadvantage single filing electric utilities, and it is only by "pure happenstance" that the midpoint is higher than the median here. Hence, SoCal Edison fails to show that the Commission's use of the median for single utilities of average risk and the midpoint when determining a generic ROE for a diverse-risk group of electric utilities necessarily disadvantages single electric utilities or violates the principle that "the return to the equity owner should be commensurate with returns on investments in other enterprises having corresponding risks." *Hope Natural Gas*, 320 U.S. at 603.

SoCal Edison's more technical arguments fare no better. Its suggestion that because the Commission screens the proxy group for atypically high or low ROEs, the Commission is not justified in using the median to lessen the impact of extreme data points is flawed. Although the use of screening parameters *lessens* the effect of high or low data points, the Commission's basic point is that use of the median, as a mathematical principle, reduces the influence of extremes, *see Northwest Pipeline*, 99 FERC at ¶ 62,276 (citing Robert D. Mason, STATISTICAL TECHNIQUES IN BUSINESS AND ECONOMICS 86–87 (3d ed. 1974); A.J. Jaffe & Herbert F. Spirer, MISUSED STATISTICS STRAIGHT TALK FOR TWISTED NUMBERS 90 (1987)). SoCal Edison is also incorrect when it suggests that in *Canadian Association* the court "rejected" the view that the median is preferable because it shows consideration of more companies in the proxy group, *see* Pet'r's Br. 34. The court concluded only that the midpoint does not "completely disregard" the central data points, 254 F.3d at 298, which does not undermine the Commission's embrace of the median here. Indeed, the court stated that the median's consideration of more data points might be "acceptable as an explanation for choosing the median over the midpoint." *Id*.

### III.

SoCal Edison also contends that, in updating its ROE, the Commission erred by taking official notice of the change in U.S. Treasury bond yields as a proxy for its private cost of capital during the locked-in period without affording it an opportunity to show to the contrary. SoCal Edison does not contest the fact of the change in the Treasury bond yields or the Commission's updating policy in general. Instead, because rehearing was its first opportunity to respond to the officially noticed data, SoCal Edison maintains that the Commission erred, to SoCal Edison's

prejudice, in refusing to consider proffered expert analysis of the unique conditions of the 2008 market collapse.

Section 556(e) of the Administrative Procedure Act ("APA") provides, "[w]hen an agency decision rests on official notice of a material fact not appearing in the evidence in the record, a party is entitled, on timely request, to an opportunity to show the contrary." 5 U.S.C. § 556(e). In *Union Electric Co. v. FERC*, 890 F.2d 1193 (D.C. Cir. 1989), the court interpreted § 556(e) in light of pre-APA decisions involving challenges to official notice, identifying two prerequisites: "First, the information noticed must be appropriate for official notice. Second, the agency must follow proper procedures in using the information, disclosing it to the parties and affording them a suitable opportunity to contradict it or 'parry its effect.'" *Id.* at 1202. The court viewed Treasury bond rates to be a type of information that was appropriate for official notice because such information is not typically subject to dispute. *Id*. at 1202–03. Union Electric, however, had raised "substantial objections" to the Commission's apparent assumption of a linear relationship between the trend for Treasury bond rates and Union Electric's cost of equity capital. *Id*. at 1203. The court held that, despite Union Electric's "partial opportunity" to oppose the Commission's updating, *id*., the Commission failed to "either accept[] or appropriately refute[]" the company's evidence and "broader attack on [the Commission's] use of the Treasury bond rates," *id.* at 1203–04; *see also Gutierrez-Rogue v. INS*, 954 F.2d 769, 773 (D.C. Cir. 1992) (due process guarantees "the right to challenge an officially noticed fact—with respect both to its truth and its significance." (citations omitted)).

The Commission took official notice, after the record had closed, of the average ten-year U.S. Treasury bond yields during the locked-in period (March 1, 2008 to December 31, 2008). *See Paper Hearing Order*, 131 FERC at ¶¶ 61,147–48. In

response, SoCal Edison proffered on rehearing an affidavit of its expert stating that those yields were not a rational proxy for its private cost of capital due to the unusual economic conditions in late 2008.  In a nutshell, this was so because the spread between the U.S. Treasury bond yields and the rates on corporate bonds increased, as investors fled from riskier corporate investments to less risky Treasury bonds, reaching proportions not seen since April 1933.  *See* Aff. of Dr. Paul T. Hunt at 6–8 (May 17, 2010).  This analysis could not have been submitted during previous proceedings because the critical economic changes occurred months after SoCal Edison's final Paper Hearing brief was filed in May 2008.

The Commission nonetheless declined to consider the affidavit, noting its general rule that once the record is closed it will not be reopened and that it generally does not allow new evidence to be introduced at the rehearing stage.  *Rehearing Order*, 137 FERC at ¶¶ 61,066–67.  The Commission explained that its "precedent requiring updating ROEs has been applied over the course of more than 25 years, during which time the U.S. economy has experienced many fluctuations," *Rehearing Order*, 137 FERC at ¶ 61,070, and that "[r]egardless of whether the ten-year bonds perfectly capture every short-term variation in the costs of equity, we continue to find . . . [that] over time the ten-year bond index continues to be a reliable barometer of overall market conditions." *Id*. at ¶ 61,071 (citation and quotation marks omitted).  The Commission also observes that *Union Electric* did "'not draw in question the Commission's past practice of making post-hearing adjustments within a range of reasonableness previously determined on the record,'" Resp't's Br. 40 (quoting *Union Electric*, 890 F.2d at 1204), and that its updating practice was approved in *Boston Edison Co. v. FERC*, 885 F.2d 962, 966–69 (1st Cir. 1989).  All true, but off point.  The petitioner in *Boston Edison* did not explain how its submission showed that a significant downward adjustment to

reflect lower interest rates was inappropriate. *Id.* at 967. Consequently, the First Circuit concluded that even if utility share returns do not exactly track changes in the Treasury rates, the Commission's downward adjustment was "perfectly reasonable" because the ultimate rate order was not unjust and unreasonable. *Id.* (citing *Hope Natural Gas*, 320 U.S. at 602). The record here, as in *Union Electric*, is different.

Application of the updating policy without regard to SoCal Edison's expert affidavit illustrates how material such an officially noticed fact can be. On the basis of the decline of the Treasury bond rates during the locked-in period, the Commission reduced SoCal Edison's base ROE by 101 basis points (1.01%), from 10.55% to 9.54%. *See Paper Hearing Order*, 131 FERC at ¶ 61,148. This makes it somewhat odd that the Commission would turn a blind eye to the information SoCal Edison proffered on rehearing. The Commission does not suggest that it has applied the updating policy in such extreme economic circumstances as occurred in late 2008. SoCal Edison thus made the necessary "good showing" that it could contest the significance of the Commission's officially noticed information based on "a[] flaw in the evidence." *BNSF Ry. Co. v. Surface Transp. Bd.*, 453 F.3d 473, 486 (D.C. Cir. 2006); *see also Tenn. Gas Pipeline Co. v. FERC*, 926 F.2d 1206, 1210 (D.C. Cir. 1991). Although the Commission responded to SoCal Edison's objections at an abstract level, and noted SoCal's argument that the corporate and Treasury bond "rates were inversely related and, therefore, not rationally related," *Rehearing Order*, 137 FERC at ¶ 61,070, it never confronted the gravity of the economic downturn or the magnitude of the yield spread as public and private bond rates moved in opposite directions. Under § 556(e), the Commission was obligated to consider and appropriately respond to SoCal Edison's effort "to parry the effect" of the officially noticed information. Because we afford SoCal Edison relief under §

556(e), we need not reach its contention that the Commission was arbitrary and capricious in applying its updating policy despite SoCal Edison's evidence, i.e., the proffered affidavit of Dr. Hunt.

Accordingly, we grant the petition in part and deny the petition in part, and remand the case to the Commission for further proceedings.