# United States Court of Appeals

## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued December 6, 2016          Decided April 14, 2017

No. 15-1118

EMERA MAINE, FORMERLY KNOWN AS BANGOR
HYDRO-ELECTRIC COMPANY, ET AL.,
PETITIONERS

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

ATTORNEY GENERAL FOR THE
STATE OF CONNECTICUT, ET AL.,
INTERVENORS

———

Consolidated with 15-1119, 15-1121

———

On Petitions for Review of Orders of the
Federal Energy Regulatory Commission

———

*David B. Raskin* argued the cause for petitioners Emera
Maine, et al.   With him on the briefs were *Gary A. Morgans*,
*Charles G. Cole*, *Jeffrey M. Jakubiak*, *Kenneth G. Jaffe*, *Sean*

*A. Atkins*, *Gunnar Birgisson*, *Stephen M. Spina*, *David R. Poe*, *Karen Krug O'Neill*, and *S. Mark Sciarrotta*. *Jason J. Fleischer* and *Mary E. Grover* entered appearances.

*David E. Pomper* argued the cause for petitioners Attorney General of Massachusetts, et al. With him on the briefs were *Scott H. Strauss*, *Latif M. Nurani*, *John P. Coyle*, *Joseph A. Rosenthal*, *Susan W. Chamberlin*, *Maura Healy*, Attorney General, Office of the Attorney General for the Commonwealth of Massachusetts, *Jeffrey A. Schwarz*, *George Jepson*, Attorney General, Office of the Attorney General for the State of Connecticut, *John S. Wright*, *Michael C. Wertheimer*, and *Clare E. Kindall*, Assistant Attorneys General, *Donald J. Sipe*, *Cynthia Arcate*, *Timothy R. Schneider*, and *Leo J. Wold*, Assistant Attorney General, Office of the Attorney General for the State of Rhode Island.

*Beth G. Pacella*, Deputy Solicitor, Federal Energy Regulatory Commission, argued the cause for respondent. With her on the brief were *Robert H. Solomon*, Solicitor, and *Lona T. Perry*, Deputy Solicitor.

*Jefffrey M. Jakubiak*, *Kenenth G. Jaffe*, *Sean A. Atkins*, *Gunnar Birgisson, Stephen M. Spina*, *David R. Poe*, *David B. Raskin*, *Gary A. Morgans*, *Charles G. Cole*, *Karen Krug O'Neill*, and *S. Mark Sciarrotta* were on the brief for intervenor Transmission Owners supporting respondent.

*Scott H. Strauss*, *David E. Pomper*, *Latif M. Nurani*, *John P. Coyle*, *Joseph A. Rosenthal*, *Susan W. Chamberlin*, *Maura Healy*, Attorney General, Office of the Attorney General for the Commonwealth of Massachusetts, *Jeffrey A. Schwarz*, *George Jepson*, Attorney General, Office of the Attorney General for the State of Connecticut, *John S. Wright*, *Michael C. Wertheimer*, and *Clare E. Kindall*, Assistant Attorneys

General, *Donald J. Sipe*, *Cynthia Arcate*, *Timothy R. Schneider*, and *Leo J. Wold*, Assistant Attorney General, Office of the Attorney General for the State of Rhode Island, were on the brief for Customers as Intervenors Supporting FERC Authority To Reduce Regulated Returns.

Before: MILLETT, *Circuit Judge*, and SENTELLE and RANDOLPH, *Senior Circuit Judges*.

Opinion for the Court filed by *Senior Circuit Judge* SENTELLE.

SENTELLE, *Senior Circuit Judge*:  Under the Federal Power Act ("FPA"), the Federal Energy Regulatory Commission ("FERC" or "the Commission") must ensure that all rates charged for the transmission or sale of electric energy are "just and reasonable."  16 U.S.C. §§ 824d(a), 824e(a).  Petitioners New England Transmission Owners ("Transmission Owners") provide transmission services for customers in New England. In 2011, Petitioners Massachusetts and various consumer-side stakeholders ("Customers") filed a complaint under section 206 of the FPA, 16 U.S.C. § 824e, alleging that Transmission Owners' base return on equity ("ROE") had become unjust and unreasonable.  FERC's orders in that section 206 proceeding are the subjects of the petitions for review in this case.

After creating a new zone of reasonableness and identifying a specific base ROE it found to be just and reasonable, FERC held that Transmission Owners' existing ROE—which was within the newly determined zone of reasonableness but did not equal FERC's new ROE—was unlawful.  FERC explained that by setting a new just and reasonable ROE, it necessarily found that Transmission Owners' existing ROE was unjust and unreasonable, thus satisfying its burdens under section 206.

In setting Transmission Owners' new ROE, FERC deviated from its traditional use of the midpoint of the zone of reasonableness, citing the presence of anomalous capital market conditions and concluding that a mechanical application of the midpoint would not result in a just and reasonable rate in this case. After considering additional record evidence, FERC placed the ROE at the midpoint of the upper half of the newly determined zone of reasonableness.

FERC then informed Transmission Owners that their total ROE—base ROE plus any incentive adders—was now capped at the upper end of the newly determined zone of reasonableness. Rather than change Transmission Owners' previously approved incentive adders, FERC explained that its decision merely applied the Commission's well-established policy that a utility's total ROE must remain within the zone of reasonableness.

Both Transmission Owners and Customers filed petitions for review challenging whether FERC satisfied the statutory requirements under section 206 in setting a new ROE. Transmission Owners argue that FERC's orders must be vacated because it failed to find that the existing ROE was unjust and unreasonable *before* setting a new ROE. Customers contend that FERC arbitrarily placed the new ROE at the midpoint of the upper half of the zone of reasonableness. Because FERC failed to articulate a satisfactory explanation for its orders, we grant the petitions for review.

**I.**

*ISO New England Tariff*

Transmission Owners are a group of privately owned utilities that provide transmission services in New England. In

2004, Transmission Owners and ISO New England, Inc. established ISO New England as a regional transmission organization. *See Conn. Dep't of Pub. Util. Control v. FERC*, 593 F.3d 30, 32 (D.C. Cir. 2010). Transmission Owners recover their transmission revenue requirements through formula rates included in ISO New England, Inc.'s open access transmission tariff ("ISO New England Tariff"). To calculate the total cost for each Transmission Owner to provide transmission service from its facilities, the ISO New England Tariff uses formula rates, which are based on the aggregated cost of all the transmission assets of each Transmission Owner. The revenue requirements for Transmission Owners are calculated using the same single base ROE. Each Transmission Owner's costs are calculated under the formula, summed, and then divided by the aggregate demand in New England to produce the regional transmission rates under the ISO New England Tariff. This is known as "rolled-in" ratemaking. *See, e.g.*, *Otter Tail Power Co.*, 12 FERC ¶ 61,169 at 61,420 (1980).

*Section 205 Proceedings Before the Commission*

Pursuant to section 205 of the FPA, 16 U.S.C. § 824d, Transmission Owners submitted a proposal in 2003 to establish ISO New England as a regional transmission organization. Transmission Owners also submitted "a related section 205 filing seeking approval for the ROE component recoverable under the regional and local transmission rates charged by ISO New England." *Bangor Hydro-Elec. Co.*, 117 FERC ¶ 61,129 at P 5 (2006), *order on reh'g*, 122 FERC ¶ 61,265 (2008), *order granting clarification*, 124 FERC ¶ 61,136 (2008), *aff'd sub nom. Conn. Dep't of Pub. Util. Control v. FERC*, 593 F.3d 30 (D.C. Cir. 2010). In 2006, FERC established the base ROE for Transmission Owners at 11.14 percent. In establishing the base ROE, FERC relied on a zone of reasonableness, determined in a discounted cash flow analysis, of 7.3 percent to 13.1 percent.

FERC also approved a number of ROE incentive adders applicable to Transmission Owners. Citing section 219 of the FPA, 16 U.S.C. § 824s, FERC established "incentive-based rate treatments to further encourage the construction of transmission facilities and replacement of aging transmission infrastructure." *S. Cal. Edison Co. v. FERC*, 717 F.3d 177, 179 (D.C. Cir. 2013) (citing *Promoting Transmission Inv. Through Pricing Reform*, 116 FERC ¶ 61,057 (2006), *order on reh'g*, 117 FERC ¶ 61,345 (2006), *order on reh'g*, 119 FERC ¶ 61,062 (2007)). All rates approved under section 219 must meet the FPA's just-and-reasonable standard. 16 U.S.C. § 824s(d). In Transmission Owners' section 205 proceeding, FERC approved a 100-basis-point adder for certain transmission projects, which we affirmed. *See Conn. Dep't of Pub. Util.* 593 F.3d at 33–37. Most of Transmission Owners' incentives were approved in separate proceedings. *See, e.g.*, *Ne. Utils. Serv. Co.*, 125 FERC ¶ 61,183 (2008), *reh'g denied*, 135 FERC ¶ 61,270 (2011); *Cent. Me. Power Co.*, 125 FERC ¶ 61,079 (2008), *reh'g denied*, 135 FERC ¶ 61,136 (2011).

*Section 206 Proceedings Before the Commission*

This case concerns FERC's determination of Customers' section 206 challenge to Transmission Owners' base ROE set in the section 205 proceedings. *See Coakley v. Bangor Hydro-Elec. Co.*, 144 FERC ¶ 63,012 (2013) ("ALJ Decision"), *aff'd in part, rev'd in part*, Opinion No. 531, 147 FERC ¶ 61,234 (2014) ("Opinion No. 531"), *order on paper hearing*, Opinion No. 531-A, 149 FERC ¶ 61,032 (2014) ("Opinion No. 531-A"), *order on reh'g*, Opinion No. 531-B, 150 FERC ¶ 61,165 (2015) ("Opinion No. 531-B").

In 2011, Customers filed a section 206 complaint with FERC alleging that Transmission Owners' 11.14 percent base

ROE had become unjust and unreasonable. The complaint was premised on Customers' contention that Transmission Owners' capital costs had declined since the base ROE was established in 2006 due to changes in the capital markets. This section 206 proceeding was "the first case of its kind to challenge utilities' base ROEs [after] the economic recession of 2007-2009 . . . ." Opinion No. 531-B, 150 FERC ¶ 61,165 at P 15 n.34.

Applying a newly created discounted cash flow zone of reasonableness of 6.1 percent to 13.2 percent, the Administrative Law Judge concluded that Transmission Owners' current 11.14 percent base ROE was unjust and unreasonable. ALJ Decision, 144 FERC ¶ 63,012 at PP 544, 587, 589. Then, using the midpoint of the newly determined zone of reasonableness, the ALJ set Transmission Owners' base ROE at 9.7 percent. *Id.* at PP 544, 587, 590.

On review of the ALJ's decision, FERC adopted a new two-step discounted cash flow, or DCF, methodology for determining an electric utility's just and reasonable ROE. *See* Opinion No. 531, 147 FERC ¶ 61,234 at PP 7–9, 13–41 (adopting the methodology historically used to set ROEs for natural gas and oil pipelines). Applying the two-step methodology in this case, FERC created a new zone of reasonableness of 7.03 percent to 11.74 percent. *Id.* at PP 125, 143; Opinion No. 531-B, 150 FERC ¶ 61,165 at P 25. In the instant proceeding, Transmission Owners and Customers do not challenge FERC's use of the two-step methodology or the resulting zone of reasonableness. Instead, they object to FERC's placement of Transmission Owners' base ROE within that newly determined zone of reasonableness.

Because the existing 11.14 percent base ROE fell within FERC's newly determined zone of reasonableness, Transmission Owners argued that FERC lacked statutory

authority under section 206 to change the existing base ROE. FERC rejected that argument, explaining that "the DCF zone of reasonableness does not establish a continuum of just and reasonable base ROEs, any one of which the utility would equally be free to charge to ratepayers; rather, only the single point approved by the Commission within the DCF zone of reasonableness is the just and reasonable base ROE." Opinion No. 531-B, 150 FERC ¶ 61,165 at P 32; *see also* Opinion No. 531, 147 FERC ¶ 61,234 at P 51; Opinion No. 531-B, 150 FERC ¶ 61,165 at PP 21–31 & n.52.

The midpoint of FERC's newly determined zone of reasonableness was 9.39 percent. Although FERC typically sets a utility's base ROE at the midpoint of the zone of reasonableness, Transmission Owners argued that a base ROE at 9.39 percent would fail to meet the capital attraction standards of *Hope* and *Bluefield*. *See FPC v. Hope Nat. Gas Co.*, 320 U.S. 591 (1944); *Bluefield Waterworks & Improvement Co. v. Pub. Serv. Comm'n of W. Va.*, 262 U.S. 679 (1923). FERC agreed, noting that "all methods of estimating the cost of equity," including the discounted cash flow analysis, "are susceptible to error when the assumptions underlying them are anomalous." Opinion No. 531-B, 150 FERC ¶ 61,165 at P 50. Because of "the undisputed presence of . . . anomalous capital market conditions," FERC had "less confidence that the midpoint of the zone of reasonableness . . . accurately reflect[ed] the equity returns necessary to meet the *Hope* and *Bluefield* capital attraction standards." *Id.* at P 49 (quoting Opinion No. 531, 147 FERC ¶ 61,234 at P 145). Accordingly, FERC determined that "a mechanical application" of the midpoint in this case would result in an ROE that was too low to satisfy *Hope* and *Bluefield*. *See id.* at PP 36, 50, 56.

Because it had "less confidence" in the results of its discounted cash flow analysis, FERC considered "additional record evidence" to inform its placement of Transmission Owners' new base ROE within the zone of reasonableness. Opinion No. 531, 147 FERC ¶ 61,234 at P 145. FERC stressed, however, that it was "not depart[ing] from [its] use of the DCF methodology; rather [it] use[d] the record evidence to inform the just and reasonable placement of the ROE within the zone of reasonableness established in the record by the DCF methodology." *Id.* at P 146. FERC considered the following alternative analyses: (1) risk premium analysis; (2) Capital Asset Pricing Model ("CAPM") analysis; (3) expected earnings analysis; and (4) comparison of state commission-approved ROEs. *Id.* at PP 145–46, 149–50; Opinion No. 531-B, 150 FERC ¶ 61,165 at P 49. After considering these alternative analyses, FERC concluded that they "corroborate[d] [its] determination that placement [of the base ROE] at a point above the midpoint was warranted." Opinion No. 531-B, 150 FERC ¶ 61,165 at P 49; *see also id.* at P 101 n.213 (stating that additional analyses supported conclusion "that the ROE should indeed be set above the midpoint"). And because it traditionally uses measures of central tendency to determine an appropriate return in ROE cases, FERC set Transmission Owners' base ROE at the midpoint of the upper half of the newly determined zone of reasonableness—10.57 percent. Opinion No. 531-B, 150 FERC ¶ 61,165 at PP 8, 33, 55; Opinion No. 531-A, 149 FERC ¶ 61,032 at PP 1, 10; Opinion No. 531, 147 FERC ¶ 61,234 at PP 9–10, 142, 151–52.

In addressing Transmission Owners' argument that section 206 requires an initial finding that the existing rate is unjust and unreasonable *before* FERC can set a new rate, the Commission stated that its analysis showing that the base ROE was 10.57 percent demonstrated "both that the[] existing 11.14 percent

ROE [was] unjust and unreasonable and that 10.57 percent is the . . . just and reasonable replacement base ROE." Opinion No. 531-B, 150 FERC ¶ 61,165 at P 33. More generally, FERC held that "both of the burdens of proof under FPA section 206 can be satisfied using a single ROE analysis—one that generates an ROE that both is below the existing ROE (thus demonstrating that the existing ROE is excessive) and that also is a just and reasonable ROE (thus demonstrating what the new ROE should be) . . . ." *Id.* at P 32; *see also id.* ("[S]howing the existing base ROE established in the prior case is unjust and unreasonable merely requires showing that the Commission's ROE methodology now produces a numerical value below the existing numerical value.").

It is undisputed that Customers sought only to challenge Transmission Owners' base ROE, and not their previously approved ROE incentives. But because the newly determined zone of reasonableness reduced the upper end of the zone from 13.1 percent to 11.74 percent, FERC reminded Transmission Owners that their total ROE—base ROE plus any incentives—must remain within the zone of reasonableness. Opinion No. 531, 147 FERC ¶ 61,234 at PP 164–65. Transmission Owners asserted that they were not given adequate notice that the incentives would be at issue and argued that FERC's decision to cap the previously approved incentives therefore did not come within section 206 and violated the Due Process Clause and the Administrative Procedure Act. *See* 16 U.S.C. § 824e(a) (stating that complaint must "state the change or changes to be made in the rate . . . then in force, and the reasons for any proposed change or changes therein"); *Pub. Serv. Comm'n of Ky. v. FERC*, 397 F.3d 1004, 1012–13 (D.C. Cir. 2005) (explaining that FERC must provide parties with adequate notice of the issues to be decided). On rehearing, FERC countered that it had not "change[d]" Transmission Owners' incentives, and thus "the issue of whether to reduce an

incentive . . . that would otherwise exceed the top of the zone of reasonableness d[id] not present any issue of material fact that would be appropriate for consideration in a hearing." Opinion No. 531-B, 150 FERC ¶ 61,165 at PP 139–41. FERC stated that it was merely following its well-established policy that a utility's total ROE—including any incentives—is "capped" at the upper end of the zone of reasonableness. *See id.*; *see also Promoting Transmission Inv. Through Pricing Reform*, 116 FERC ¶ 61,057 at PP 2, 93 (noting that "the approved ROE, including the impact of an incentive," must be within the zone of reasonableness). Accordingly, FERC held that Transmission Owners' total ROE, including any incentives, "would be capped at the upper end of the . . . DCF-determined zone of reasonableness," meaning that Transmission Owners would not be permitted to "fully implement" their incentives "due to changes in the zone of reasonableness . . . ." Opinion No. 531-B, 150 FERC ¶ 61,165 at P 139.

Transmission Owners and Customers each filed petitions for review. We have jurisdiction pursuant to 16 U.S.C. § 825*l*(b).

## II.

The FPA allows public utilities to collect "just and reasonable" rates for the transmission or sale of electric energy. 16 U.S.C. §§ 824d(a), 824e(a); *see also Morgan Stanley Capital Grp., Inc. v. Pub. Util. Dist. No. 1 of Snohomish Cty.*, 554 U.S. 527, 531 (2008). Because FERC oversees all prices for interstate electricity transactions, *FERC v. Elec. Power Supply Ass'n*, 136 S. Ct. 760, 767 (2016), it must ensure that rates charged by utilities are just and reasonable, *Pub. Serv. Comm'n of Ky.*, 397 F.3d at 1006; *Towns of Concord, Norwood, & Wellesley v. FERC*, 955 F.2d 67, 68 (D.C. Cir.

1992).  As we have stated, "FERC, not the Judiciary, has the principal statutory role in determining the reasonableness of rates . . . ."  *Blumenthal v. FERC*, 613 F.3d 1142, 1147 (D.C. Cir. 2010).  The Natural Gas Act ("NGA") also employs the "just and reasonable" standard, *see* 15 U.S.C. §§ 717c(a), 717d(a); therefore, judicial interpretations of the FPA and the NGA may be followed interchangeably.  *Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 577 n.7 (1981); *City of Anaheim v. FERC*, 558 F.3d 521, 523 n.2 (D.C. Cir. 2009).

"Statutory reasonableness is an abstract quality" that "allows a substantial spread between what is unreasonable because too low and what is unreasonable because too high." *FPC v. Conway Corp.*, 426 U.S. 271, 278 (1976) (quoting *Montana-Dakota Util. Co. v. Nw. Pub. Serv. Co.*, 341 U.S. 246, 251 (1951)).  The FPA's just-and-reasonable requirement "is obviously incapable of precise judicial definition . . . ." *Morgan Stanley*, 554 U.S. at 532.  Thus, FERC's responsibility is to "reduce the abstract concept of reasonableness to concrete expression in dollars and cents," and it is the rate eventually set by the Commission "that governs the rights of buyer and seller."  *Montana-Dakota*, 341 U.S. at 251.  FERC is not required "to adopt as just and reasonable any particular rate level," *In re Permian Basin Area Rate Cases*, 390 U.S. 747, 767 (1968), and it "has discretion regarding the methodology by which it determines whether a rate is just and reasonable," *S. Cal. Edison Co. v. FERC*, 717 F.3d 177, 182 (D.C. Cir. 2013) (citing *FPC v. Hope Nat. Gas Co.*, 320 U.S. 591, 602 (1944)); *see also S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 55 (D.C. Cir. 2014) (stating that FERC has "considerable latitude in developing a methodology responsive to its regulatory challenge" (citations and internal quotation marks omitted)).

At issue in this proceeding is FERC's determination of a just and reasonable ROE.  An ROE is "the cost to the utility of

raising capital." *Canadian Ass'n of Petroleum Producers v. FERC*, 254 F.3d 289, 293 (D.C. Cir. 2001). To attract investors, a utility must offer a sufficient "risk-adjusted expected ROE." *S. Cal. Edison*, 717 F.3d at 179 (citation omitted). An ROE "should be commensurate with returns on investments in other enterprises having corresponding risks" and "sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital." *Hope Nat. Gas*, 320 U.S. at 603; *see also Bluefield Waterworks & Improvement Co.*, 262 U.S. at 692–93. Otherwise put, an ROE should allow a utility "to adequately compete for the investor's dollar." *See Anaheim v. FERC*, 669 F.2d 799, 801, 803 (D.C. Cir. 1981).

Because "[r]atemaking . . . is not a science," however, FERC must use models "to inform, not rigidly to determine, [its] judgment" as to an appropriate ROE for a utility. *Boston Edison Co. v. FERC*, 885 F.2d 962, 969–70 (1st Cir. 1989). One model FERC employs to determine a utility's ROE is the discounted cash flow, or DCF, analysis. *See United Airlines, Inc. v. FERC*, 827 F.3d 122, 128 (D.C. Cir. 2016); *S. Cal. Edison*, 717 F.3d at 179. This model "projects investor growth expectations over the long term by adding average dividend yields to estimated constant growth in dividends over the indefinite future." *Williston Basin Interstate Pipeline Co. v. FERC*, 165 F.3d 54, 57 (D.C. Cir. 1999); *see also Town of Norwood v. FERC*, 80 F.3d 526, 533 (D.C. Cir. 1996). "The Discounted Cash Flow model flows from the classical valuation theory that the value of a financial asset is determined by its ability to generate future cash flows." *Tenn. Gas Pipeline Co. v. FERC*, 926 F.2d 1206, 1208 n.2 (D.C. Cir. 1991) (citation, internal quotation marks, and ellipsis omitted); *see also United Airlines*, 827 F.3d at 128.

To calculate the ROE for a utility that is not publicly traded, FERC relies on the ROEs for a "proxy group" of comparable publicly traded companies. *S. Cal. Edison*, 717 F.3d at 179; *Williston Basin*, 165 F.3d at 57. After adjusting that range of ROEs to exclude unrepresentative high or low rates, "the Commission assembles a zone of reasonable ROEs on which to base a utility's ROE." *S. Cal. Edison*, 717 F.3d at 179 (citations omitted); *see also Canadian Ass'n of Petroleum Producers v. FERC*, 308 F.3d 11, 12–13 (D.C. Cir. 2002); *Williston Basin*, 165 F.3d at 57. The zone of reasonableness is intended to balance the interests of investors and consumers, *Pac. Gas & Elec. Co. v. FERC*, 306 F.3d 1112, 1116 (D.C. Cir. 2002), and typically results in a broad range of potentially reasonable ROEs, *see Panhandle E. Pipe Line Co. v. FERC*, 777 F.2d 739, 746–47 (D.C. Cir. 1985). After assembling this zone of reasonableness, FERC assesses the utility's circumstances to determine whether to make "pragmatic adjustment[s]" to the rate. *Canadian Ass'n*, 308 F.3d at 15 (quoting *Tenn. Gas Pipeline*, 926 F.2d at 1209); *see also Williston Basin*, 165 F.3d at 57 (stating that the assigned rate "reflect[s] specific investment risks associated with th[e] [utility]").

FERC's adjudication of just and reasonable ROEs is governed by "[t]wo related but distinct sections of the" FPA. *FirstEnergy Serv. Co. v. FERC*, 758 F.3d 346, 348 (D.C. Cir. 2014). Section 205, 16 U.S.C. § 824d, "confers upon FERC the duty to ensure that wholesale energy rates and services are just and reasonable" by requiring "regulated utilities to file with the Commission tariffs outlining their rates for FERC's approval." *FirstEnergy*, 758 F.3d at 348 (citing 16 U.S.C. § 824d(a), (c)). In a section 205 proceeding, the utility is not required to show that a previous rate was unlawful. *See Ala. Power Co. v. FERC*, 993 F.2d 1557, 1571 (D.C. Cir. 1993).

However, in this case we review FERC's determination under section 206, not 205.  Section 206 permits, indeed requires, FERC to determine whether an existing rate is "unjust, unreasonable, unduly discriminatory or preferential . . . ."  16 U.S.C. § 824e(a).  Only *after* having made the determination that the utility's existing rate fails that test may FERC exercise its section 206 authority to impose a new rate.  *See, e.g.*, *Atl. City Elec. Co. v. FERC*, 295 F.3d 1, 10 (D.C. Cir. 2002); *Cities of Bethany v. FERC*, 727 F.2d 1131, 1143 (D.C. Cir. 1984).  The burden of demonstrating that the existing ROE is unlawful is on FERC or the complainant, not the utility.  16 U.S.C. § 824e(b); *FirstEnergy*, 758 F.3d at 353.

**III.**

We review FERC's ratemaking orders under the Administrative Procedure Act's arbitrary and capricious standard.  *FERC v. Elec. Power Supply Ass'n*, 136 S. Ct. 760, 782 (2016).  The scope of our review is "narrow."  *Id.* (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  We must uphold FERC's orders unless they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 54 (D.C. Cir. 2014) (citing *Midwest ISO Transmission Owners v. FERC*, 373 F.3d 1361, 1368 (D.C. Cir. 2004)).  "[W]e may not substitute our own judgment for that of the Commission," and we do not ask whether FERC's "decision is the best one possible or even whether it is better than the alternatives."  *Elec. Power*, 136 S. Ct. at 782.  Instead, "[o]ur role . . . is to [ensure] that the Commission's judgment is supported by substantial evidence and that the methodology used in arriving at that judgment is either consistent with past practice or adequately justified."  *Town of Norwood*, 80 F.3d at 533 (citations and internal

quotation marks omitted); *see also S.C. Pub. Serv. Auth.*, 762 F.3d at 54.

We are mindful that Congress entrusted the regulation of electric energy rates to FERC, not the courts. *Elec. Power*, 136 S. Ct. at 784; *Blumenthal v. FERC*, 552 F.3d 875, 884 (D.C. Cir. 2009). Moreover, because "[t]he statutory requirement that rates be 'just and reasonable' is obviously incapable of precise judicial definition, . . . we afford great deference to the Commission in its rate decisions." *Morgan Stanley*, 554 U.S. at 532. Our review in ratemaking cases is therefore "limited to ensuring that the Commission has made a principled and reasoned decision supported by the evidentiary record." *S. Cal. Edison*, 717 F.3d at 181 (citation omitted). Despite our highly deferential standard of review, it bears repeating that "courts have never given regulators carte blanche." *Elec. Consumers Res. Council v. FERC*, 747 F.2d 1511, 1514 (D.C. Cir. 1984) (citation omitted).

We apply this deferential standard in evaluating the issues raised in the petitions before us. First, Transmission Owners contend that FERC failed to satisfy its burden under section 206 of demonstrating that the existing 11.14 percent base ROE, which was within FERC's newly determined zone of reasonableness, was unjust and unreasonable. Second, Transmission Owners challenge the impact of FERC's decision to set a new base ROE on their previously approved ROE incentives. Customers argue that FERC acted arbitrarily and capriciously in placing Transmission Owners' base ROE at the midpoint of the upper half of the newly determined zone of reasonableness. We address Transmission Owners' petition first.

*"Unjust and Unreasonable" Determination*

Transmission Owners argue that FERC failed to follow the two-step procedure mandated by section 206 when it changed their base ROE. Specifically, Transmission Owners contend that, rather than first finding that their existing base ROE was unjust and unreasonable, FERC began by determining that 10.57 percent would be a just and reasonable base ROE and only then found the existing 11.14 percent ROE to be unlawful because it was not equivalent to 10.57 percent. FERC does not actually challenge Transmission Owners' description of its process. Rather, it argues that its determination of a new just and reasonable base ROE was "sufficient" by itself to prove that the existing base ROE was unjust and unreasonable. *See* Resp't Br. 28–29. We conclude that FERC did not meet the first requirement of section 206 that it demonstrate the unlawfulness of Transmission Owners' base ROE.

We begin our analysis by clarifying what *is not* required of FERC. Transmission Owners, relying on dictum from *City of Winnfield v. FERC*, 744 F.2d 871 (D.C. Cir. 1984), argue that FERC must show that an existing rate is "entirely outside the zone of reasonableness" before it can exercise its section 206 authority to change that rate. *Id.* at 875; *see also Tex. E. Transmission Corp.*, 32 FERC ¶ 61,056 at 61,150 (1985). The crux of Transmission Owners' argument appears to be that in a section 206 proceeding, the established zone of reasonableness is "coextensive" with the statutory just-and-reasonableness standard, and therefore, FERC must accept as just and reasonable all ROEs within the discounted cash flow zone of reasonableness. FERC rejected that argument and so do we.

The zone of reasonableness informs FERC's selection of a just and reasonable rate. *See S. Cal. Edison*, 717 F.3d at 179; *Williston Basin*, 165 F.3d at 57; *Boston Edison*, 885 F.2d at

969–70.  But the zone of reasonableness represents a "broad" range of potentially just and reasonable ROEs, "not an exact dollar figure . . . ."  *Panhandle E. Pipe Line Co.*, 777 F.2d at 746; *see also Conway*, 426 U.S. at 278; *Permian Basin*, 390 U.S. at 770.  As long as the rate selected by the Commission is within the zone of reasonableness, FERC is not required "to adopt as just and reasonable any particular rate level." *Permian Basin*, 390 U.S. at 767.  Whether a particular rate within the zone is the just and reasonable rate for the utility at issue depends on a number of factors.  *See, e.g.*, *Canadian Ass'n*, 308 F.3d at 15.  Thus, the fact that a rate falls within the zone of reasonableness does not establish that the rate is *the* just and reasonable rate for the utility at issue.

To support their claim that FERC lacks the authority under section 206 to reduce a base ROE that falls within the zone of reasonableness, Transmission Owners rely upon cases that explain the boundaries for courts reviewing FERC's ratemaking decisions.  But these cases do not address the showing necessary under section 206 to find that an existing rate is unjust and unreasonable.  In *Montana-Dakota Utilities Co. v. Northwestern Public Service Co.*, 341 U.S. 246 (1951), for example, the Supreme Court explained that, because statutory reasonableness "allows a substantial spread" of potentially reasonable rates, a court has no authority to fix a rate different from the one chosen by FERC "on the ground that, in its opinion, it is the only or the more reasonable one." *See id.* at 250–52.  As we have held, "[a]bsent procedural or methodological flaws, the court may only set aside a rate that is outside a zone of reasonableness . . . ." *Pac. Gas & Elec.*, 306 F.3d at 1116.

Conversely, although courts afford deference to FERC's ratemaking decisions, a reviewing court must set aside any rate, even one within the zone of reasonableness, if FERC's

procedure or methodology was flawed. *See id.* While we have recognized FERC's discretion in ratemaking cases, we have stated that "in all cases, the Commission must explain its reasoning when it purports to approve rates as just and reasonable." *TransCanada Power Mktg. Ltd. v. FERC*, 811 F.3d 1, 12 (D.C. Cir. 2015). Whether a rate, even one within the zone of reasonableness, is unlawful depends on the particular circumstances of the case. As the Supreme Court has held, "one rate in its relation to another rate may be discriminatory, although each rate [p]er se, if considered independently, might fall within the zone of reasonableness." *Conway*, 426 U.S. at 278 (citation omitted). FERC itself recognizes the limits of its discretion. In *Bangor Hydro-Electric Co.*, for example, the Commission stated that "[c]ertain rates, though within the zone, may not be just and reasonable given the circumstances of the case." 122 FERC ¶ 61,038 at P 11. Neither the language of the FPA nor our precedents compel FERC to accept all rates within the discounted cash flow zone of reasonableness as just and reasonable in a section 206 proceeding.

The FPA, by requiring FERC to show that an existing rate is unlawful before ordering a new rate under section 206, provides a form of "statutory protection" to a utility. *City of Winnfield*, 744 F.2d at 875. Thus, while showing that the existing rate is entirely outside the zone of reasonableness may illustrate that the existing rate is unlawful, *see, e.g.*, *Pub. Serv. Comm'n of N.Y. v. FERC*, 642 F.2d 1335, 1350 n.27 (D.C. Cir. 1980), that is not the *only* way in which FERC can satisfy its burden under section 206. As the parties agree, section 206 required FERC to make an explicit finding that Transmission Owners' existing rate was unjust and unreasonable before proceeding to set a new rate. *See* Opinion No. 531-B, 150 FERC ¶ 61,165 at P 33; Opinion No. 531, 147 FERC ¶ 61,234 at P 50. FERC failed to make such a finding in this case.

FERC misunderstood and misapplied its dual burden under section 206. Sections 205 and 206 are "related but distinct" provisions of the FPA. *FirstEnergy*, 758 F.3d at 348. The purpose of section 206 is "quite different" from that of section 205. *City of Winnfield*, 744 F.2d at 875. Section 205 enables a utility to propose changes in its own rates. Section 206 empowers FERC to modify existing rates upon complaint or on FERC's own initiative. *FirstEnergy*, 758 F.3d at 348–49. In contrast to section 206, section 205 "is intended for the benefit of the utility," *City of Winnfield*, 744 F.2d at 875, and "FERC plays 'an essentially passive and reactive' role under section 205," *Atl. City Elec.*, 295 F.3d at 10 (quoting *City of Winnfield*, 744 F.2d at 876)). Section 206's procedures are "entirely different" and "stricter" than those of section 205. *City of Anaheim*, 558 F.3d at 525.

One "important difference[]" between section 205 and section 206 is the burden of proof, *Ala. Power*, 993 F.2d at 1571, a difference that FERC failed to recognize in this case. A utility filing a rate adjustment under section 205 must show that the adjustment is *lawful*. *Id.* The proponent of a rate change under section 206, however, bears "the burden of proving that the existing rate is *unlawful*." *Id.* (emphasis added) (citations omitted); *see also Papago Tribal Util. Auth. v. FERC*, 723 F.2d 950, 952–53 (D.C. Cir. 1983); *N.J. Bd. of Pub. Utils. v. FERC*, 744 F.3d 74, 94–95 (3d Cir. 2014). Therefore, unlike section 205, section 206 mandates a two-step procedure that requires FERC to make an explicit finding that the existing rate is unlawful before setting a new rate.

As "a 'creature of statute,'" FERC has only those powers endowed upon it by statute. *Atl. City Elec.*, 295 F.3d at 8. We presume that, in a statute, Congress meant what it said and said what it meant. *See Simmons v. Himmelreich*, 136 S. Ct. 1843,

1848 (2016); *Va. Dep't of Med. Assistance Servs. v. Dep't of Health & Human Servs.*, 678 F.3d 918, 922–23 (D.C. Cir. 2012). Section 206 grants FERC the authority to change an existing rate "[w]henever the Commission . . . shall find that [the] rate . . . is unjust[] [or] unreasonable . . . ." 16 U.S.C. § 824e(a). FERC has "undoubted power under section 206" to change an existing rate "*whenever it determines such rate*[] *to be unlawful*." *FPC v. Sierra Pac. Power Co.*, 350 U.S. 348, 353 (1956) (emphasis added). In section 206, Congress specified that "FERC itself may establish the just and reasonable rate, provided that it *first* determines that a rate set by a public utility is unjust[] [or] unreasonable . . . ." *Cities of Bethany*, 727 F.2d at 1143 (emphasis added). "[T]he directive to impose a just and reasonable rate . . . is triggered *only* by the Commission's finding that the existing one is 'unjust[] [or] unreasonable . . . .'" *Am. Gas Ass'n v. FERC*, 912 F.2d 1496, 1504 (D.C. Cir. 1990) (emphasis added) (quoting 15 U.S.C. § 717d(a)).

In other words, a finding that an existing rate is unjust and unreasonable is the "condition precedent" to FERC's exercise of its section 206 authority to change that rate. *Sierra Pac. Power*, 350 U.S. at 353. Section 206 therefore imposes a "dual burden" on FERC. *FirstEnergy*, 758 F.3d at 353. Without a showing that the existing rate is unlawful, FERC has no authority to impose a new rate. *See Fla. Gas Transmission Co. v. FERC*, 604 F.3d 636, 640–41 (D.C. Cir. 2010) (examining similar requirement under the NGA); *Sea Robin Pipeline Co. v. FERC*, 795 F.2d 182, 187 (D.C. Cir. 1986) (same). Thus, while "[t]he 'just and reasonable' lodestar is no loftier under section 206 than under section 205," *FirstEnergy*, 758 F.3d at 353, the showing required of FERC to exercise its section 206 authority to change an existing rate is different from anything required for FERC to approve a utility's proposed rate adjustment under section 205.

FERC recognized its dual burden in this section 206 proceeding. *See* Opinion No. 531-B, 150 FERC ¶ 61,165 at PP 28–29; Opinion No. 531, 147 FERC ¶ 61,234 at P 50. But in reaching its decision, FERC rejected Transmission Owners' argument that the burden under section 206's first step was "very different from and more difficult to satisfy" than the showing required under both section 206's second step and section 205:

> In making these arguments, [Transmission Owners] are confusing differences in who bears the burden of persuasion as between FPA sections 205 and 206 with the substantive "just and reasonable" standard contained in both those sections. . . . While the party bearing the burden of persuasion is different under FPA section 205 and FPA section 206, the scope and purpose of the Commission's review remains the same — to determine whether the rate fixed by the utility is lawful.

> ****

> Because sections 205 and 206 are part of a single statutory scheme, it follows that a rate that is lawful under one section must also be lawful under the other and a rate that is unlawful under one section must also be unlawful under the other. For this to be true, the substantive standard to determine lawfulness under each section — the just and reasonable standard — must be applied in the same manner under each section.

Opinion No. 531-B, 150 FERC ¶ 61,165 at PP 28–30 (citation, internal quotation marks, and alteration omitted).  FERC held that it could satisfy its dual burden through "a single ROE analysis . . . that generates an ROE that both is below the existing ROE (thus demonstrating that the existing ROE is excessive) and that also is a just and reasonable ROE (thus demonstrating what the new ROE should be) . . . ."  *Id.* at P 32.  FERC thus concluded that its single ROE analysis showing that 10.57 percent was a just and reasonable ROE for Transmission Owners satisfied "both burdens under section 206."  *Id.* at P 33.

In determining that its "single ROE analysis" satisfied both of its burdens, FERC relied on the general principle that it is the Commission's duty to translate the "abstract concept" of reasonableness into a "concrete rate," and it is that rate—"not the abstract concept"—that governs the rights of the utility and the consumers.  *Id.* at P 32 & n.65 (citing *Montana-Dakota*, 341 U.S. at 251).  Based on this reasoning, FERC asserted that "only the single point approved by the Commission within the DCF zone of reasonableness is the just and reasonable base ROE."  *Id.* at P 32.  FERC went on to hold:

> It follows that showing the existing base ROE established in the prior case is unjust and unreasonable merely requires showing that the Commission's ROE methodology now produces a numerical value below the existing numerical value.
>
> ****
>
> [T]he statute requires that, under section 206, before we may change an ROE we must find it unjust and unreasonable.  And, in Opinion No. 531, that we did.  Our ROE analysis showing

that the [Transmission Owners'] base ROE is 10.57 percent demonstrates both that their existing 11.14 percent ROE is unjust and unreasonable and that 10.57 percent is the [Transmission Owners'] just and reasonable replacement base ROE. Thus, we met both burdens under section 206.

*Id.* at PP 32, 33; *see also* Opinion No. 531-A, 149 FERC ¶ 61,032 at P 10 (concluding that existing rate was unlawful based on finding that 10.57 percent was a just and reasonable rate).

FERC's decision—that a single ROE analysis generating a new just and reasonable ROE necessarily proved that Transmission Owners' existing ROE was unjust and unreasonable—relied on its assumption that all ROEs other than the one FERC identifies as the utility's just and reasonable ROE are *per se* unlawful in a section 206 proceeding. *See* Opinion No. 531-B, 150 FERC ¶ 61,165 at P 33. But, as we have explained, the zone of reasonableness creates a broad range of potentially lawful ROEs rather than a single just and reasonable ROE, meaning that FERC's finding that 10.57 percent was a just and reasonable ROE, standing alone, "did not amount to a finding that every other rate of return was not." *See Papago*, 723 F.2d at 957; *see also Conway*, 426 U.S. at 277–79. Because it was a section 206 proceeding, rather than a section 205 proceeding, FERC bore the burden of making an explicit finding that the existing ROE was *unlawful* before it was authorized to set a new *lawful* ROE. *See, e.g.*, *Atl. City Elec.*, 295 F.3d at 9–10; *Ala. Power*, 993 F.2d at 1571.

FERC, however, never actually explained how the existing ROE was unjust and unreasonable. FERC correctly noted that rates within the zone of reasonableness are not *per se* just and

reasonable, depending upon "the circumstances of the case." Opinion No. 531-B, 150 FERC ¶ 61,165 at P 25. But FERC "made no effort" to explain what circumstances rendered Transmission Owners' existing rate unlawful. *See W. Res., Inc. v. FERC*, 9 F.3d 1568, 1580 (D.C. Cir. 1993). Instead, FERC concluded that the existing 11.14 percent base ROE was unlawful solely because it had determined that 10.57 percent, which was "a numerical value below the existing numerical value," was a just and reasonable base ROE. Opinion No. 531-B, 150 FERC ¶ 61,165 at P 32. That conclusion, without any further explanation, is insufficient to prove that Transmission Owners' existing base ROE was unlawful. *See Papago*, 723 F.2d at 956–58. Further, the mere fact that FERC eventually reduces the zone of reasonableness to a single ROE does not relieve the Commission of its burden under section 206. Without the requisite findings, FERC's reasoning in this case effectively eliminated section 206's statutory directive that existing rates be found unlawful before FERC has the authority to change those rates.

To satisfy its dual burden under section 206, FERC was required to do more than show that its single ROE analysis generated a new just and reasonable ROE and conclusively declare that, consequently, the existing ROE was *per se* unjust and unreasonable. Although we defer to FERC's expertise in ratemaking cases, the Commission's decision must actually be the result of reasoned decision-making to receive that deference. Without further explanation, a bare conclusion that an existing rate is "unjust and unreasonable" is nothing more than "a talismanic phrase that does not advance reasoned decision making." *See TransCanada*, 811 F.3d at 12–13. Because FERC's single ROE analysis failed to include an actual finding as to the lawfulness of Transmission Owners' existing base ROE, FERC acted arbitrarily and outside of its statutory authority in setting a new base ROE for Transmission

Owners. In light of FERC's failure to satisfy its dual burden under section 206, we need not reach Transmission Owners' arguments concerning their previously approved ROE incentives.

*Placement of the Base ROE within the Zone of Reasonableness*

Customers' petition is also well taken. After performing its analysis, FERC abandoned its traditional use of the midpoint of the zone of reasonableness in setting Transmission Owners' base ROE. Instead, FERC picked the midpoint of the upper half of the zone of reasonableness as the new base ROE. FERC, however, did not set forth a rational connection between the record evidence and its placement of the base ROE.

FERC has discretion to make "pragmatic adjustments" to a utility's ROE based on the "particular circumstances" of a case. *FPC v. Nat. Gas Pipeline Co.*, 315 U.S. 575, 586 (1942); *see also Canadian Ass'n*, 308 F.3d at 15; *Town of Norwood*, 80 F.3d at 534–35. But, this discretion must be exercised "within the ambit of [FERC's] statutory authority." *Nat. Gas Pipeline*, 315 U.S. at 586. "Although it is not our role to tell the Commission what the 'correct' rate of return calculation is, . . . we do have an obligation to remand when the Commission's conclusions are contrary to substantial evidence or not the product of reasoned decisionmaking . . . ." *Pub. Serv. Comm'n of N.Y. v. FERC*, 813 F.2d 448, 465 (D.C. Cir. 1987) (citations omitted). In determining whether FERC's ROE decision is just and reasonable, we examine "the method employed in reaching that result." *City of Charlottesville v. FERC*, 661 F.2d 945, 950 (D.C. Cir. 1981) (citing *Permian Basin*, 390 U.S. at 791–92).

In this case, the zone of reasonableness was 7.03 percent to 11.74 percent. FERC typically sets a utility's base ROE at

the midpoint of the zone of reasonableness—in this case, 9.39 percent.  Opinion No 531-B, 150 FERC ¶ 61,165 at P 36.  We have noted that the midpoint is a good "starting place" for the placement of the ROE.  *See Tenn. Gas Pipeline*, 926 F.2d at 1213; *see also Pub. Serv. Comm'n of Ky.*, 397 F.3d at 1010–11.  As we explained above, however, FERC may make adjustments to a utility's ROE based on the specific circumstances of the case.  *See, e.g.*, *Nat. Gas Pipeline*, 315 U.S. at 586.

After FERC performed its discounted cash flow analysis, it concluded that "unique" and "anomalous" capital market conditions undermined the reliability of the results of that analysis in setting Transmission Owners' new base ROE.  Opinion No. 531, 147 FERC ¶ 61,234 at PP 142, 145, 150; Opinion No. 531-B, 150 FERC ¶ 61,165 at PP 49–50.  FERC determined that, because of the presence of "unusual capital market conditions," it had "less confidence" that "a mechanical application" of the midpoint of the DCF zone of reasonableness would result in an ROE that satisfied the *Hope* and *Bluefield* capital attraction standards.  *See* Opinion No. 531, 147 FERC ¶ 61,234 at PP 142, 145; Opinion No. 531-B, 150 FERC ¶ 61,165 at PP 49, 56.

Because of its lack of confidence in the reliability of its analysis, FERC turned to "alternative benchmark methodologies" and "additional record evidence" to inform its placement of the base ROE.  Opinion No. 531-B, 150 FERC ¶ 61,165 at P 36-37.  Although FERC concluded that these analyses supported a finding that a 9.39 percent ROE was too low to satisfy the *Hope* and *Bluefield* standards, *see* Opinion No. 531, 147 FERC ¶ 61,234 at PP 146–50, 152; Opinion No. 531-B, 150 FERC ¶ 61,165 at P 37, none of the analyses necessarily suggested that a 10.57 percent ROE was a just and reasonable base ROE.  Thus, the only conclusion FERC drew

from these analyses was that Transmission Owners were entitled to an ROE somewhere above the 9.39 percent midpoint of the zone of reasonableness. *See* Opinion No. 531, 147 FERC ¶ 61,234 at PP 146–50; Opinion No. 531-B, 150 FERC ¶ 61,165 at PP 37, 49, 101 n.213, 128.

But FERC still needed to settle on a new base ROE for Transmission Owners. Noting that it "has traditionally looked to the central tendency" in identifying an appropriate ROE, FERC selected the midpoint of the upper half of the zone of reasonableness—in this case, 10.57 percent—which it had done "in the past." Opinion No. 531, 147 FERC ¶ 61,234 at PP 151–52. Notably, this 10.57 percent base ROE was higher than 35 of the 38 data points FERC used to construct its DCF zone of reasonableness. In reaching its decision, FERC failed to explain how any evidence demonstrated that 10.57 percent was a just and reasonable base ROE for Transmission Owners. This omission is particularly troublesome in light of FERC's prior concerns over the reliability of its newly determined zone of reasonableness. We therefore conclude that in placing the base ROE within the zone of reasonableness, FERC failed to establish a "rational connection" between the record evidence and its decision. *Elec. Power*, 136 S. Ct. at 782 (citation omitted).

As an initial matter, FERC concluded that the evidence supported a finding that 9.39 percent was too low of a rate to satisfy the *Hope* and *Bluefield* capital attraction standards. *See* Opinion No. 531, 147 FERC ¶ 61,234 at PP 142, 145, 150; Opinion No. 531-B, 150 FERC ¶ 61,165 at PP 7, 49–50. But it never found that its chosen rate, 10.57 percent, actually satisfied those standards. Similarly, although FERC noted that a decrease from 11.14 percent (the existing base ROE) to 9.39 percent (the midpoint of the newly determined zone of reasonableness) could "undermine" Transmission Owners'

ability to attract capital investments, Opinion No. 531, 147 FERC ¶ 61,234 at P 150, it never explained how its ultimate placement of the base ROE at 10.57 percent was appropriate.

Moreover, FERC never explained how 10.57 percent was just and reasonable when the alternative benchmarks and additional record evidence it used to justify a departure merely pointed to a base ROE somewhere above 9.39 percent. When making adjustments in setting a utility's base ROE, FERC must adequately explain how the evidence it relied on "support[ed] the conclusion it reached." *Wis. Gas Co. v. FERC*, 770 F.2d 1144, 1156 (D.C. Cir. 1985) (citation omitted); *see also Tenn. Gas Pipeline*, 926 F.2d at 1209, 1212–13. In this case, FERC stressed that it used the alternative analyses *only* "to inform the just and reasonable placement of the ROE within the zone of reasonableness," *see* Opinion No. 531, 147 FERC ¶ 61,234 at PP 145–46; Opinion No. 531-B, 150 FERC ¶ 61,154 at PP 49–50, and the only conclusion it reached from these alternative analyses was that "the ROE should . . . be set above the midpoint," *see* Opinion No. 531-B, 150 FERC ¶ 61,165 at PP 37, 49, 128, 101 n.213. FERC's reasoning is unclear. On the one hand, it argued that the alternative analyses supported its decision to place the base ROE above the midpoint, but on the other hand, it stressed that none of these analyses were used to select the 10.57 percent base ROE.

A review of the findings of the alternative analyses highlights the problem. FERC found the results of three of the alternative benchmark methodologies "informative": the risk premium analysis, the CAPM analysis, and the expected earnings analysis. *See* Opinion No. 531, 147 FERC ¶ 61,234 at P 146, Opinion No. 531-B, 150 FERC ¶ 61,165 at P 37. The risk premium analysis supported a base ROE between 10.7 percent and 10.8 percent, the CAPM analysis produced a midpoint of 10.4 percent (with a zone of reasonableness of 7.4

percent to 13.3 percent), and the expected earnings analysis had a midpoint of 12.1 percent (with a zone of reasonableness of 8.1 percent to 16.1 percent). Opinion No. 531, 147 FERC ¶ 61,234 at P 147. FERC never explained how these analyses justified a 10.57 percent base ROE, and, in fact, it stressed that it did *not* rely on those analyses in setting the base ROE. *See, e.g.*, Opinion No. 531-B, 150 FERC ¶ 61,165 at PP 91, 103, 120. FERC also relied on evidence of state commission-approved ROEs, but it acknowledged that 89 percent of the state commission-authorized ROEs were below its chosen rate of 10.57 percent. Opinion No. 531-B, 150 FERC ¶ 61,165 at P 85; *see also* Opinion No. 531, 147 FERC ¶ 61,234 at P 148. Similar to the alternative benchmarks, FERC maintained that it did not use the state commission-authorized ROEs in setting Transmission Owners' actual base ROE. *See, e.g.*, Opinion No. 531-B, 150 FERC ¶ 61,165 at P 80. FERC argues that these analyses, taken together, merely supported its conclusion that 9.39 percent was too low and that Transmission Owners' base ROE should be set somewhere above the zone of reasonableness's midpoint. Thus, while the alternative benchmarks and additional record evidence may have shown that some "upward adjustment" was warranted, *see* Opinion No. 531, 147 FERC ¶ 61,234 at 62,473 (Norris, dissenting in part), they did not justify the specific placement of the base ROE at 10.57 percent.

Finally, FERC's explanation for selecting 10.57 percent as the base ROE was insufficient. Rather than citing record evidence demonstrating that 10.57 percent was a just and reasonable base ROE, FERC simply noted that it "traditionally looked to the central tendency" to set an ROE and then chose the midpoint of the upper half of the zone of reasonableness because it had done so "in the past." Opinion No. 531, 147 FERC ¶ 61,234 at PP 151–52; *see also* Opinion No. 531-B, 150 FERC ¶ 61,165 at P 55.

To support its assertion that its previous decisions dictated a top-quarter placement for the base ROE, FERC relied on two prior cases, *Southern California Edison Co.*, 92 FERC ¶ 61,070 (2000), and *Consumers Energy Co.*, 85 FERC ¶ 61,100 (1998). Opinion No. 531, 147 FERC ¶ 61,234 at P 152 n.307. But those cases do not support FERC's decision. In the prior cases, a utility's ROE was set at the midpoint of the upper half of the zone of reasonableness because the utility was "more risky" than the proxy group. *See S. Cal. Edison*, 92 FERC ¶ 61,070 at 61,266–67; *Consumers Energy*, 85 FERC ¶ 61,100 at 61,363–64. In both *Southern California Edison* and *Consumers Energy*, FERC knew only that the utility at issue was riskier than the proxy group, meaning that the utility's costs fell somewhere above the midpoint of the zone of reasonableness. Thus, in those cases, the midpoint of the upper half was "an obvious place to begin." *See Tenn. Gas Pipeline*, 926 F.2d at 1213. Conversely, FERC expressly held in this case that Transmission Owners were "comparable in risk" to the proxy group. Opinion No. 531-B, 150 FERC ¶ 61,165 at P 47. Without more specific findings as to Transmission Owners' circumstances, FERC's precedent did not justify its decision in this case.

FERC essentially chose the midpoint of the upper half of the zone because it determined that once it concluded that an upward adjustment from the midpoint of the zone of reasonableness was appropriate, the midpoint of the upper half of the zone was the only available ROE. *Cf.* Opinion No. 531, 147 FERC ¶ 61,234 at P 151 n.306 ("Nothing in this order precludes participants in [unrelated] proceedings from developing a record . . . supporting a different point in the range of reasonable returns than the midpoint of the upper half of the range." (citation omitted)). Such conclusory reasoning does not establish "a rational connection" between the record

evidence and FERC's decision.  *See Elec. Power*, 136 S. Ct. at 782.

We emphasize that our review is limited to ensuring that FERC "made a principled and reasoned decision supported by the evidentiary record."  *S. Cal. Edison*, 717 F.3d at 181 (citation omitted).  It is not our job to tell FERC what the "correct" ROE is for Transmission Owners, but it is our duty to ensure that FERC's decision is "the product of reasoned decisionmaking." *Pub. Serv. Comm'n of N.Y.*, 813 F.2d at 465 (citations omitted).  While the evidence in this case may have supported an upward adjustment from the midpoint of the zone of reasonableness, FERC failed to provide any reasoned basis for selecting 10.57 percent as the new base ROE.

## IV.

For the foregoing reasons, the petitions for review are granted.  We therefore vacate FERC's orders and remand the case for proceedings consistent with this opinion.

*So ordered.*